United States Court of Appeals,

Eleventh Circuit.

No. 95-3339.

The FUND FOR ANIMALS, INC., Defenders of Wildlife, Florida Biodiversity Project, Maynard L. Hiss, Holly Jensen, Sierra Club, Environmental Confederation of Southwest Florida, Plaintiffs-Appellants,

v.

Terry R. RICE, Colonel, District Engineer, U.S. Army Corps of Engineers, Bruce Babbitt, Secretary, Department of the Interior, Mollie Beattie, Director, U.S. Fish and Wildlife Service, John Wesley White, County Administrator, Sarasota County, Sarasota County, a political subdivision of the State of Florida, Defendants-Appellees,

Carol Browner, Administrator, Environmental Protection Agency, Defendant.

June 13, 1996.

Appeal from the United States District Court for the Middle District of Florida. (No. 94-1913-CIV-T-23E), Steven D. Merryday, Judge.

Before KRAVITCH, DUBINA and CARNES, Circuit Judges.

DUBINA, Circuit Judge:

The Plaintiffs-Appellants ("the Plaintiffs"), seek to prevent the construction of a municipal landfill on a site in Sarasota County, Florida, that the Plaintiffs claim is an indispensable habitat for the highly endangered Florida Panther and also home to the threatened Eastern Indigo Snake. The Plaintiffs bring this case before us to challenge the district court's grant of summary judgment in favor of the Defendants-Appellees ("the Defendants"). The district court's challenged judgment has thus far allowed Sarasota County to proceed with construction of the landfill. For the reasons stated below, we affirm the district court's judgment.

I. BACKGROUND

*A. The Florida Panther and the Eastern Indigo Snake*

The Florida Panther (*Felis concolor coryi* ) was listed as endangered in 1967. *See* 32 Fed.Reg. 4001. This panther, which is a subspecies of the cougar, "is a large, slender cat, tawny above and whitish below." David S. Maehr,*The Florida Panther,* in 1 *Rare and Endangered Biota of Florida* 176 (Stephen R. Humphrey et al. eds., 1992) (hereinafter "Maehr"). According to the Fish and Wildlife Service ("the F.W.S."), the Florida Panther is "one of the most endangered large mammals in the world." F.W.S. Biological Opinion for the Sarasota Landfill Project at 10 (April 3, 1995) (hereinafter "F.W.S. Opinion").[1] Although the Florida Panther once ranged throughout the Southeastern United States, it has been reduced to a single population in south Florida. The "geographic isolation, habitat loss, small population size, and associated inbreeding" of the remaining population have resulted in a significant loss of health and genetic variability in Florida Panthers. F.W.S. Opinion at 10-11. According to current estimates, there are only 30-50 adult Florida Panthers left in the wild.[2] *Id.* However, the record in this case indicates that there

---

[1]"F.W.S. Opinion" refers only to the 1995 Biological Opinion. As discussed *infra,* the F.W.S. completed three separate Biological Opinions for the Sarasota landfill project. However, the first one, completed in 1990, did not concern either the Florida Panther or the Eastern Indigo Snake. The second one, completed in 1994, addressed concerns regarding the Florida Panther and the Eastern Indigo Snake, but was superseded by the third opinion, the "F.W.S. Opinion," completed in 1995.

[2]It is unknown how many Florida Panthers once roamed the Southeastern United States. Theoretical estimates place approximately 1,360 Panthers in what is now Florida. Ken Alvarez, *Twilight of the Panther* 35 (1993). Anecdotal evidence from early American history suggests the presence, at one time, of large panther populations in the American South. For example,

have been no confirmed sightings of the Florida Panther in the area in which the landfill is to be built.[3]

The Eastern Indigo Snake (*Drymarchon corais couperi* ) was listed as threatened in 1978. *See* 43 Fed.Reg. 4028. Measuring up to 81/2 feet, this docile, nonpoisonous snake is the longest found North America. Paul E. Mohler,*The Eastern Indigo Snake*, in 3 *Rare and Endangered Biota of Florida* 181 (Paul E. Mohler et al. eds. 1992) (hereinafter "Mohler"). Although this iridescent black snake once ranged throughout Florida, Georgia, southeastern South Carolina, southern Alabama, and southern Mississippi, its known populations are now restricted to certain areas in Florida and Georgia. F.W.S. Opinion at 24. The F.W.S. has not yet designated any critical habitat for the Eastern Indigo Snake.

*B. The Landfill*

On November 22, 1989, the United States Army Corps of

---

a narrative of Hernando deSoto's 16th Century expedition to Florida told of "many lions and bears ..." *Id.* at 36 (citations omitted). While traveling through Georgia during Colonial times, naturalist William Bartram observed that "bears, tygers [panthers], wolves and wild cats ... are numerous enough." *Id.* (citation omitted).

[3]The landfill site is located fifty miles north of the Caloosahatchee River. Florida Panthers have not been documented north of this river, which proceeds inland from Fort Myers and then generally northeast. The Plaintiffs' allegation that anecdotal evidence proves that there are now Florida Panthers north of the Caloosahatchee River is not persuasive. While anecdotal sightings of Florida Panthers have been reported, such information is generally unsupported by verifiable documentation. Florida Panthers by nature are "secretive and illusive and seldom observed," and "confusion and misidentification with the more widely distributed bobcat" is common. F.W.S. Opinion at 18. The very expert upon whom the Plaintiffs rely has indicated to the F.W.S. that "the fact that there are no records of road kills is *compelling evidence* that Panthers are not present [in or around the landfill site]." F.W.S. Opinion at 17 (referencing Maehr, D., emphasis supplied).

Engineers ("the Corps") received an application from Sarasota County, Florida ("Sarasota County" or "the County") for a permit under Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387.  The proposed project for which Sarasota County sought a permit consists of constructing an 895-acre landfill and required ancillary structures on a 6,150-acre site known as the "Walton Tract."  The Walton Tract is located in west central Sarasota County, north of the Caloosahatchee River, west of the Myakka River, and just southwest of the Myakka River State Park.  According to current projections, the fill material for the landfill will impact approximately seventy-four acres of isolated wetlands.[4]  The project also includes construction of a roadway extension ("the Knights Trail Road extension"), consisting of approximately 2.5 miles of new road and impacting 0.47 acres of wetlands.

During June of 1990, the Corps dispersed notice of Sarasota County's application to government agencies, private organizations, and other interested persons.  The notice invited public comment on the landfill proposal.  Two months later, the F.W.S. issued a

---

[4]For purposes of the CWA, the Corps defines wetlands as:

> [T]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a revalence of vegetation typically adapted for life in saturated soil conditions.  Wetlands generally include swamps, marshes, bogs, and similar areas.

40 C.F.R. § 232.2(r);  see Sheldon M. Novick et al. eds., Environmental Law Institute, 2 *Law of Environmental Protection* § 12.06[1][b] (1994).

Biological Opinion consenting to the project.[5]  However, the Environmental Protection Agency ("the E.P.A.") recommended denial of the permit under Section 404(b)(1) of the guidelines promulgated pursuant to the Clean Water Act.  At that time, Sarasota County projected that the landfill would affect 120 acres of wetlands.

The following year, Sarasota County submitted an alternative analysis, which included modifications of the project calculated to reduce the prospective effect on wetlands.  Four Sites, labeled D, E, F (the Walton Tract), and G, were proposed for the landfill. During September of 1993, Sarasota County submitted a revised plan that would reduce the landfill's effect on wetlands from 120 acres to approximately seventy-four acres.  In February of 1994, the E.P.A. notified the Corps that it no longer objected to the issuance of the permit.

At the end of May 1994, the Corps completed an Environmental Assessment and Statement of Findings, determining that no environmental impact statement was required.  In addition, the Corps announced that a public hearing would not benefit the decision-making process. After nearly five years of administrative review, the Corps approved the requested permit on June 3, 1994. On August 10, 1994, the Corps verified the applicability of Nationwide Permit No. 26 to Sarasota County's proposal to fill 0.47 acre of wetlands as part of the Knight's Trail Road extension project.

---

[5]In consenting to the project in 1990, the F.W.S. indicated that the landfill would not affect the Wood Stork (*Mycteria americana* ).  The F.W.S. did not, at that time, consider the effects that the landfill would have on the Florida Panther and the Eastern Indigo Snake.

On June 17, 1994, the Plaintiffs submitted a sixty-day notice of intent to sue. The Plaintiffs alleged violations of the Clean Water Act and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1534-44. Two months later, the F.W.S. requested resumption of § 7 consultation under the ESA to allow consideration of any potential effect on the Florida Panther and the Eastern Indigo Snake.[6]

In October of 1994, the F.W.S. issued its first Biological Opinion addressing concerns regarding the Florida Panther and the Eastern Indigo Snake. The Opinion concluded that the project was unlikely to jeopardize further the existence of either the Florida Panther or the Eastern Indigo Snake. However, it did include an "incidental take" statement for the Eastern Indigo Snake and recommendations for Florida Panther conservation, wetland preservation, and a monitoring program. The Corps incorporated the F.W.S.'s recommendations and modified Sarasota County's permit on

---

[6]Section 7 of the ESA requires that federal agencies consult with the F.W.S. to ensure that actions the agency authorizes are not likely to jeopardize the continued existence of species listed as "threatened" or "endangered," or adversely modify or destroy habitat designated as critical to the survival of a listed species. 16 U.S.C. § 1536. If the proposed action may affect a listed species, formal consultation between the agency and the F.W.S. is required. *Id.;* 50 C.F.R. § 402.14. When formal consultation is initiated, the agency is required to provide the F.W.S. information about the proposed project and the "best scientific and commercial data available." 50 C.F.R. § 402.14(d). The F.W.S. then prepares a biological opinion including: (1) a conclusion regarding whether the proposed action is likely to jeopardize the continued existence of a listed species or adversely modify critical habitat; (2) when necessary, an "incidental take" statement regarding animals likely to be killed by the project; and (3) reasonable and prudent alternatives to the action if the proposed action is likely to jeopardize a species. *Id.* The phrases "jeopardize the continued existence of," "destruction or adverse modification," and "incidental take" are defined by regulation at 50 C.F.R. § 402.02.

November 14, 1994.  Two weeks later, the Plaintiffs commenced an action in federal district court against the Corps, the F.W.S., the E.P.A.,[7] and the Sarasota County Administrator.

In response to the suit, the F.W.S. requested that the Corps resume § 7 consultation on the permit.  The Corps suspended Sarasota County's permit the next day, and on February 7, 1995, the Corps also suspended its verification of coverage for discharge of fill associated with the Knight's Trail Road extension project.  In April of 1995, the F.W.S. issued to the Corps its second Biological Opinion addressing concerns regarding the Florida Panther and the Eastern Indigo Snake.  The Opinion included both an "incidental take" statement for the Eastern Indigo Snake[8] and conservation recommendations for the Florida Panther.  This Opinion, which superseded the F.W.S.'s previous Biological Opinion, again concluded that the proposed project was unlikely to jeopardize the continued existence of either the Florida Panther or the Eastern Indigo Snake.  *See* F.W.S. Opinion at 1.[9]

---

[7]The E.P.A. was later omitted from the Plaintiffs' Second Amended Complaint.

[8]This "incidental take" statement permits Sarasota County to kill up to fifty-two snakes within "the footprint of the landfill" and to "take" an additional two snakes per year in connection with the construction and use of the access road during the life of the project.  Assuming the life of the project is thirty-nine years, as projected, the F.W.S. will thus allow the County to kill up to 130 Eastern Indigo Snakes as "incidental" to the landfill project.  However, the F.W.S. specifically determined that this level of take would not jeopardize the existence of the Eastern Indigo Snake due to the remaining level of population elsewhere in the snake's range. *See* F.W.S. Opinion at 26, 28-29.

[9]This Opinion, as well as the previous one, are referred to as "no jeopardy" opinions.  A "no jeopardy" biological opinion is a scientific determination by the F.W.S. that the proposed action

On April 12, 1995, the Plaintiffs submitted comments to the Corps on the F.W.S.'s new Biological Opinion. The next day, the Corps determined, based on the F.W.S.'s Biological Opinion and the Corps' independent environmental assessment, that reinstatement of the permit to dredge and fill seventy-four acres of wetlands with additional modifications was in the public interest. Thus, the modified permit was reinstated on April 13, 1995.

Following final issuance of the permit, the Plaintiffs filed their Second Amended Complaint, which raised claims under the Clean Water Act, the Endangered Species Act, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-70d. The Complaint requested declaratory and injunctive relief. Sarasota County agreed to halt construction temporarily to allow the district court time to reach a considered decision after full briefing on the merits. In return, the Plaintiffs consented to expedite the process of district court review. In particular, the parties agreed to submit the case to the court on cross-motions for summary judgment. The district court heard oral argument on June 29, 1995.

During oral argument, the Plaintiffs requested leave of the court, should their summary judgment motion be denied, to pursue discovery on the issue of whether United States Senator Bob Graham (D-Florida) had improperly intervened on Sarasota County's behalf.

---

is "not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. 402.14(h)(3). A "jeopardy" opinion can be issued only when the proposed federal action is expected "to reduce appreciably the likelihood of both the survival and recovery" of a listed species. *Id.* at 402.02.

The Plaintiffs based their discovery request on a memorandum that indicated that Senator Graham had contacted the Attorney General regarding the litigation and was working to see if the Department of Justice would withdraw a recommendation that a draft environmental assessment of the project be made available for public comment.

On October 12, 1995, the district court granted summary judgment in favor of Sarasota County and denied the Plaintiffs' contingent request for discovery. The Plaintiffs filed a notice of appeal and asked this court to grant an emergency injunction prohibiting Sarasota County from commencing construction of the new facility until resolution of the appeal. This court denied the Plaintiffs' emergency motion for an injunction pending appeal in an order dated October 26, 1995, and set an expedited briefing schedule.

## II. STATEMENT OF THE ISSUES

(1) Whether the district court erred in finding that the Corps did not act arbitrarily or capriciously in making the following three decisions:

    A. to grant a permit to fill seventy-four acres of wetland on the Walton Tract for a county landfill;

    B. not to hold its own public hearing on the project; and

    C. not to prepare an Environmental Impact Statement under NEPA.

(2) Whether the district court erred in finding that the F.W.S. did not violate the ESA by issuing "no jeopardy" Biological Opinions and in finding that the Corps did not act arbitrarily or capriciously in relying on those Opinions.

(3) Whether the district court erred in denying the Plaintiffs an opportunity to take discovery on the extent to which the Corps' decision may have been ~~inappropriately~~

influenced by Senator Graham's intervention.

## III. STANDARDS OF REVIEW

The standard of review applicable to the main issues in this case is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, which states that a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). On appeal, this court, in reviewing the administrative record, applies the same arbitrary and capricious standard of review utilized by the district court. *North Buckhead Civic Ass'n v. Skinner,* 903 F.2d 1533, 1538-39 (11th Cir.1990). As we recently explained, this standard is exceedingly deferential:

> To determine whether an agency decision was arbitrary and capricious, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must be "searching and careful,' but "the ultimate standard of review is a narrow one.' Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the *least* latitude in finding grounds for reversal; "[a]dministrative decisions should be set aside in this context ... only for substantial procedural or substantive reasons as mandated by statute, ... not simply because the court is unhappy with the result reached.' The agency must use its best judgment in balancing the substantive issues. The reviewing court is not authorized to substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action.

*Skinner,* 903 F.2d at 1538-40 (footnotes and citations omitted) (emphasis added). *See also Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

The standard of review applicable to the district court's decision regarding discovery is the abuse of discretion standard. *See, e.g., Castle v. Sangamo Weston, Inc.,* 744 F.2d 1464, 1466 (11th Cir.1984).

IV. DISCUSSION

This court recognizes that, with respect to both the Florida Panther and the Eastern Indigo Snake, "[t]he most insidious and far reaching threat to the survival of [the] species is habitat loss or degradation."  Mohler at 184 (regarding the Eastern Indigo Snake); *accord* Maehr at 180 (regarding the Florida Panther).  The present case, however, involves a challenge to administrative action governed by the APA.  Therefore, we can set aside the federal agencies' actions here only if we find that the agencies abused their discretion, or acted arbitrarily, capriciously, or contrary to law.  *See Skinner,* 903 F.2d at 1538-39.  In this case, it is readily apparent that in approving the landfill location the Federal agencies acted in a manner that was not an abuse of discretion, arbitrary, capricious, or contrary to law. Accordingly, we will not set aside the federal agencies' actions.

*A. Challenges Under The Clean Water Act*

The CWA prohibits the discharge of pollutants, including dredged spoil, into the waters of the United States, [10] except in compliance with various sections of the CWA, including Section 404. 33 U.S.C. § 1311(a).  Section 404(a) authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredge or fill material into waters of the United States.  33 U.S.C. § 1344(a).  The Corps may issue individual permits on a case-by-case basis, or it may issue general permits on a state, regional, or nationwide basis.  33 U.S.C. § 1344(a), (e).

---

[10] "Waters of the United States" is defined by regulation to include wetlands.  33 C.F.R. 328.3(a), (b).

The Plaintiffs allege that the Corps violated the substantive and procedural requirements of the CWA in three ways: (1) by not choosing an alternative site where the landfill would have a less adverse impact on wetlands; (2) by not considering the cumulative impact of the permitting decision; and (3) by not giving notice and an opportunity for a public hearing on the permit. We consider each of these contentions in turn.

1. *Alternative Sites*

The Plaintiffs' primary argument is that the Corps ignored alternative sites where the landfill would have had less of an impact on the aquatic ecosystem. Under applicable Section 404 guidelines, a discharge of dredge or fill will not be permitted if, among other things, there is a "practicable alternative" to the proposed discharge that would have a less adverse impact on the aquatic ecosystem. 33 U.S.C. § 1344(b)(1); 40 C.F.R. § 230.10(a). An alternative is considered practicable if "it is available and capable of being done after taking into consideration cost, existing technology and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). The guidelines create a rebuttable presumption that practicable alternatives are available where the activity associated with a proposed discharge would occur on a wetland and is not water dependent. 40 C.F.R. 230.10(a)(3). If the Corps finds that the permit complies with the Section 404(b)(1) guidelines, the permit "will be granted unless the district engineer determines that it would be contrary to the public interest." 33 C.F.R. § 320.4(a)(1). The public interest review evaluates "the probable impacts, including cumulative

impacts, of the proposed activity and its intended use on the public interest." *Id.*

According to the Plaintiffs, Sarasota County itself identified three such practicable alternatives, and use of any of these sites would result in less harm to the environment than use of the Walton Tract. The Plaintiffs rely heavily on a particular section of a 1991 study performed by Sarasota County in which the County considered alternatives to the Walton Tract. As part of this study, Sarasota County assigned a numerical "environmental score" to each of the four potential sites. The scoring system was designed to give higher scores to those sites most suited for a landfill. As the following point totals illustrate, the Walton Tract received the lowest numerical score of the four tracts in the analysis: Site D—39 points; Site E—39 points; Site F, (the Walton Tract)—34 points; and Site G—41 points.

Nonetheless, the Plaintiffs' argument that an alternative to the Walton Tract should have been chosen is meritless for two reasons. First, the ranking was done by Sarasota County and not the Corps, and the Corps is not bound by an applicant's ranking system. In fact, the Corps conducts its own independent evaluation, and its practicable alternative analysis is not susceptible to numerical precision, but instead requires a balancing of the applicant's needs and environmental concerns. *See Sylvester v. United States Army Corps of Eng'rs,* 882 F.2d 407, 409 (9th Cir.1989); *Louisiana Wildlife Fed'n, Inc. v. York,* 761 F.2d 1044, 1048 (5th Cir.1985) (per curiam).

Second, the Corps and Sarasota County point to numerous

reasons to explain why, although the Walton Tract received the lowest environmental score, it was nonetheless the most suited for placement of a landfill. Specifically, our review of the record persuades us that the Corps did not act contrary to, but instead adhered to the sequencing preference expressed in the CWA regulations: (1) avoidance, (2) minimization, and (3) compensatory mitigation. *See* 33 C.F.R. 320.4(r); 40 C.F.R. 230.10.

As its first task, the Corps determined that there was no alternative site available that would avoid any impact on wetlands. Had a suitable upland site existed, such a site would have been entitled to a presumption that it was a practical alternative. *See* 40 C.F.R. § 230.10(a)(3).[11] Each of the four highest ranking sites contain scattered, isolated wetlands: Site D is 19% wetlands, Site E is 22% wetlands, Site G is 13% wetlands, and the Walton Tract is 22% wetlands. A landfill of 895 acres in Sarasota County would involve impacts on aquatic ecosystems (i.e., filling of wetlands) and raise the same Section 404 permitting concerns no matter which of the four sites was chosen. Since the Plaintiffs have not identified an 895-acre parcel of contiguous uplands in all of Sarasota County, it is not clear that the presumption established by 40 C.F.R. § 230.10(a)(3) would ever apply in this case.

The absence of a suitable upland site required the Corps to analyze all suitable alternatives. In this case, each of the alternative sites poses its own environmental problems which led the Corps to determine that it was less suitable for the landfill

---

[11]The Corps also considered a no-action alternative, which was rejected because the County's existing landfill capacity is expected to be reached by 1999.

than the Walton Tract. Site D contains wetlands across its southern boundary, including the headwaters for a stream know as South Creek. The site contains ninety-two acres of wetlands, which is eighteen more acres of wetlands than would be filled by the project if done on the Walton Tract. Most notably, Site D is confirmed to be a nesting site for the Bald Eagle (*Haliaeetus leucocephalus* ).[12] Site E borders the Myakka River State Park and contains two large wetland systems that drain to both the Myakka River and a waterway called the Cow Pen Slough. Site E contains sixty-one acres of wetlands. Presence of a state listed species, the Florida Sandhill Crane (*Grus canadensis* ), was confirmed on the site. Moreover, any landfill located on Site G would have been within the Myakka River watershed. The Corps noted the probable presence of the Eastern Indigo Snake on Site G, and Site G was also designated a "Priority 1 Florida Panther habitat."[13]

By contrast, the Walton Tract possesses characteristics that the Corps considered to be significant environmental advantages. Each of the other sites is considerably smaller than the Walton Tract: Site D is 2,130 acres, Site E is 3,360 acres, and Site G is 2,100 acres. The Walton Tract is 6,150 acres. Thus, the site is large enough to provide a broad natural vegetative buffer around

---

[12]At the time the prospect sites were being evaluated, the Bald Eagle was listed as an endangered species. However, on July 12, 1995, the Bald Eagle was formally removed from the endangered species list and is classified as threatened.

[13]"Priority 1 Panther habitat" means that the F.W.S. has identified the areas as containing "those lands that should be preserved first and are characterized as areas most frequently used by panthers and/or land of high quality suitable native habitat." F.W.S. Opinion at 13.

all sides of the landfill. The large size of the tract also allows a substantial buffer between the landfill and adjoining areas. Sarasota County has zoned approximately 2,971 acres on the site as a conservation area, which includes the most valuable areas of upland wetland habitat on the Walton Tract and adjoins other preserve areas off-site. These preserved lands combine with adjacent properties to form a continuous unit of potentially suitable Florida Panther habitat and serve as a barrier between the Myakka River ecosystem and further development from the west.

Where, as here, filling of wetlands cannot be avoided, then "appropriate and practicable steps" must be taken to minimize the potential adverse impacts of the discharge on wetlands. 40 C.F.R. § 230.10(d). While the original design of the landfill would have impacted approximately 120 acres, Sarasota County subsequently scaled down the project so that wetland impacts would be reduced to approximately seventy-four acres. Furthermore, although the project will eliminate approximately seventy-four acres of isolated wetlands, the large size of the Walton Tract allows on-site mitigation. Sarasota County is replacing the lost acreage with approximately seventy acres of wet prairie habitat in the northeast corner of the tract and enhancing and restoring an additional 262 acres of wetlands. While wetlands will be lost, a greater acreage of higher quality wetlands will be restored and enhanced, resulting in no net loss of wetland resources. *See, e.g., National Wildlife Fed'n v. Whistler,* 27 F.3d 1341, 1346 (8th Cir.1994) (affirming permit where no net loss of nation's wetlands); *see also Town of Norfolk,* 968 F.2d at 1449; *Friends of the Earth v. Hintz,* 800 F.2d

822, 836 (9th Cir.1984).

In discussing the alternatives analysis, the district court did not suggest, nor do we, that practicable alternatives may be ignored because of the mitigation potential of a site, as the Plaintiffs claim. To the contrary, the district court recognized, as do we, that the Corps had taken into account all the considerations which factor into the alternatives analysis. There is no substantial question as to whether Sarasota County needs a new landfill, because the County's current landfill must close in 1999. Sarasota County, the Corps, the F.W.S., and the E.P.A. all scrutinized the project for over five years, and all agree that the Walton Tract is the most suitable site for the new landfill. Accordingly, insofar as the CWA practicable alternatives analysis is concerned, we hold that the Plaintiffs failed to demonstrate that the Corps acted arbitrarily and capriciously in granting a permit to fill seventy-four acres of wetlands on the Walton Tract.[14]

2. *Cumulative Impacts*

Secondarily, the Plaintiffs claim that the Corps failed to take into account the impact of its decision on the survival and recovery of the Florida Panther "in light of the many *other* projects that are currently under way or planned in South Florida." Appellant's Br. at 40-41. This argument is meritless. The Corps' Statement of Findings clearly indicates that the Corps gave full

---

[14]The Plaintiffs argue that the Okeechobee landfill, which is outside Sarasota County, is a practical alternative. The Corps disagrees. It appears that the Okeechobee landfill lacks sufficient capacity to handle the amount of waste anticipated to be generated in Sarasota County and, indeed, even today has not been expanded by its developers and cannot yet accommodate inter-county waste.

consideration to all pertinent cumulative impacts. *See* A.R. 149 at 48-51. While recognizing that the project will eliminate some potential Florida Panther habitat, the Corps also determined that the "proposed project will not have an *adverse* impact on this unoccupied habitat" because the "preservation of 2,970 acres of land as part of the compensation for wetland impacts will preserve the option to provide for future Florida Panther habitat [should Florida Panthers be relocated there]." *Id.* The Plaintiffs' assertion that destruction of Florida Panther habitat south of the Caloosahatchee River increases the need to preserve it in another region is thus met by the commitment of the 2,970 acres for future Florida Panther habitat. In sum, the Plaintiffs have failed to demonstrate that the Corps acted arbitrarily and capriciously in analyzing the cumulative effects of the proposed landfill.

3. *Public Hearings*

The Plaintiffs' third argument under the CWA is that the Corps violated requirements by failing to provide the public "any hearings" on the landfill project and by failing to provide the public with information regarding possible effects of the project on the Florida Panther and the Eastern Indigo Snake. The CWA mandates an "opportunity for public hearings." *See* 33 U.S.C. § 1344(a). However, the statute does not state that the Corps itself must hold its own public hearings regardless of how many other hearings have been held on a project. The applicable regulations provide the Corps discretion to hold hearings on permit applications on an "as needed" basis. 33 C.F.R. § 327.4. If the Corps determines that it has the information necessary to reach a

decision and that there is "no valid interest to be served by a hearing," the Corps has the discretion not to hold one. *Id.* at § 327.4(b).

Here, the Corps recognized that two public hearings on the project had already been conducted under the state process. Given the information generated from these hearings and the voluminous written information submitted to the Corps by opponents of the project, including the Plaintiffs, the Corps concluded that holding its own additional public hearing was unlikely to generate any new information that was not already in the Corps' possession. Moreover, the Plaintiffs point to no such information. Under these circumstances, we are persuaded that the Corps did not act arbitrarily or abuse its discretion in deciding to forego further public hearings on the matter.

The Plaintiffs also argue that the public notice provided by the Corps was defective because: (1) it failed to specifically state that the project could potentially affect the Florida Panther and the Eastern Indigo Snake; and (2) it did not mention or illustrate the creation of a three-mile access road on the Walton Tract. These arguments are meritless. First, the notice of the permit application was widely disseminated in June of 1990 as required by 33 C.F.R. § 325.3(a). The notice informed the public that "several threatened or endangered species may be expected to be present on the site" and invited comment. Nothing in the applicable statutes or regulations requires a species-by-species listing in the notice, and no further notice is required by statute or regulation.

Second, while the Plaintiffs are correct that the public notice did not mention the access road, the applicable regulations give the Corps discretion about whether to issue supplemental public notice about such matters. Such notice is to be distributed by the district engineer "if in his view there is a change in the application data that would affect the public's review of the proposal." 33 C.F.R. 325.2(a)(2). The Corps considered the road to be a minor change in the application data and declined to issue supplemental notice. Given that the road's construction affects less than one-half acre of additional wetlands, this conclusion was not arbitrary or capricious.

*B. Preparation of Environmental Impact Statement Under the National Environmental Policy Act.*

The Plaintiffs allege that the Corps' decision not to prepare an Environmental Impact Statement violated NEPA and its implementing regulations by ignoring evidence of the project's harmful effects. The NEPA requires a federal agency to prepare an Environmental Impact Statement if the agency proposes to undertake a "major federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The statute imposes procedural but not substantive requirements on the agency. "NEPA does not work by mandating that agencies achieve particular substantive environmental results." *Marsh v. Oregon Natural Resources Council,* 490 U.S. at 371, 109 S.Ct. at 1858. Instead, NEPA "works" by requiring that the environmental consequences of an action be studied before the proposed action is taken. *Id.*

In deciding whether to prepare an Environmental Impact Statement for a proposed action, an agency must initially determine

if the action is of a type that (1) normally requires the preparation of an Environmental Impact Statement, or (2) normally does not require either an Environmental Impact Statement or an Environmental Assessment. 40 C.F.R. § 1501.4(a). If the proposed action falls into neither category, the agency must prepare an Environmental Assessment 40 C.F.R. § 1501.4(b). The Environmental Assessment is expected to be a brief and concise document containing sufficient evidence and analysis for the agency to determine whether to prepare an Environmental Impact Statement or a Finding of No Significant Impact ("FONSI"). "The purpose of an [Environmental Assessment] is to determine whether there is enough likelihood of significant environmental consequences to justify the time and expense of preparing an environmental impact statement." *River Road Alliance, Inc. v. Corps of Eng'rs of U.S. Army*, 764 F.2d 445, 449 (7th Cir.1985), *cert. denied*, 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986).

The role of the court in reviewing the sufficiency of an agency's consideration of environmental facts is limited both by the time in which the decision was made and by the statute mandating review. *Vermont Yankee Nuclear Power Corp. v. Nat'l Resource Defense Council, Inc.*, 435 U.S. 519, 555, 558, 98 S.Ct. 1197, 1217, 1219, 55 L.Ed.2d 460 (1978). Moreover, this Circuit has stated that a court's "only role [under NEPA] is to ensure that the agency has taken a "hard look' at the environmental consequences of the proposed action." *Druid Hills Civic Ass'n v. Federal Highway Admin.*, 772 F.2d 700, 709 (11th Cir.1985) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730

n. 21, 49 L.Ed.2d 576 (1976)).

The Plaintiffs contend that the Corps' decision not to prepare an Environmental Impact Statement in this case fell short of the requisite "hard look" and that the Corps' actions were a mere "paperwork exercise." Appellants' Br. at 43. In response, the Corps and Sarasota County argue that the Environmental Assessment prepared in this case satisfied the need for a hard look at the project and that the Environmental Assessment supported the Corps' FONSI, which obviated the need to prepare an Environmental Impact Statement.

The Corps prepared its Environmental Assessment for the project in April of 1995. The Environmental Assessment resulted in a FONSI, meaning that the Corps concluded that no Environmental Impact Statement was required for the project. At this point, the Corps had the benefit of two separate "no jeopardy" F.W.S. Biological Opinions regarding the Florida Panther and the Eastern Indigo Snake, approval by the E.P.A., voluminous information (including expert opinions) provided by the Plaintiffs, and information resulting from the two public hearings the state had held on the project. In light of the five preceding years of extensive administrative review, it would be difficult for us to conclude that the Corps failed to take a hard look at the project before deciding to forego the time and administrative costs of preparing an Environmental Impact Statement. Instead, we hold that the Corps did not act arbitrarily or capriciously by concluding that it had before it sufficient information to determine that the project would not significantly affect the quality of the human

environment and that preparation of an Environmental Impact Statement was therefore unnecessary. As explained by the Supreme Court:

> [O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot interject itself within the area of discretion of the executive.

*Stryker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1979) (citation and internal quotation marks omitted).

*C. Challenges Pursuant to the Endangered Species Act*

The Plaintiffs claim that § 4(f) of the ESA requires the Corps and the F.W.S. to implement the 1987 Recovery Plan for the Florida Panther and that the Corps and the F.W.S., in violation of the ESA, are failing in that regard. [15] The Plaintiffs' reasoning can be summarized as follows: (1) the ESA requires that recovery plans shall be developed and implemented for endangered species; (2) the F.W.S.'s 1987 Recovery Plan for the Florida Panther includes a "Habitat Preservation Plan" stating that "areas proposed for habitat preservation," which include the Walton Tract, "should be monitored to the maximum extent possible to obviate adverse habitat modifications;" (3) the F.W.S. fails to "implement" the Recovery Plan if it issues a "no jeopardy" opinion for a suitable Florida Panther habitat as specified by the Recovery Plan; and (4) the

---

[15]Section 4 of the ESA addresses "recovery plans," which formulate actions designed to enhance species recovery to the point where ESA protection is no longer needed. 16 U.S.C. § 1533(f). The Secretary is required to "develop and implement" such plans "unless he finds that such a plan will not promote conservation of the species." *Id.*

Corps acted arbitrarily and capriciously in relying on the F.W.S. "no jeopardy" Opinions in granting a permit to Sarasota County.

The Plaintiffs' line of reasoning is flawed in several respects.  First, the practical effect of the Plaintiffs' position would be to elevate the 1987 Recovery Plan into a document with the force of law.  We cannot take such an approach.  Section 1533(f) makes it plain that recovery plans are for guidance purposes only. *See* 16 U.S.C. § 1533(f).  By providing general guidance as to what is required in a recovery plan, the ESA "breathe[s] discretion at every pore."  *Strickland v. Morton,* 519 F.2d 467, 469 (9th Cir.1975).

Second, the Plaintiffs' position cannot be reconciled with the Corps' statutory duty under § 7 of the ESA to consult with the F.W.S. about the environmental impact of proposed agency actions and the F.W.S.'s duty to arrive at a biological opinion based upon the best scientific data available.  There would be absolutely no point to the consultation and preparation of a biological opinion if the F.W.S.'s opinion were predetermined based upon whether proposed project lands fell within the borders of properties discussed in one of any number of recovery plan documents.  The Plaintiffs thus misconstrue the interrelationship and legal effect of the 1987 Recovery Plan on the 1995 F.W.S. Biological Opinion.

Third, the F.W.S. identified reasonable justifications for issuing its "no jeopardy" Biological Opinions.  To begin with, there have been no verified Florida Panther sightings either on the Walton Tract or near it within the last ten years.  According to the Florida Panther Habitat Protection Plan ("HPP"), there is no

occupied Florida Panther territory anywhere in Sarasota County. [16]
The HPP concludes, some anecdotal evidence notwithstanding, that no occupied Florida Panther habitat exists in Sarasota County or, for that matter, anywhere north of the Caloosahatchee River.  Moreover, the contested land has not been designated as critical habitat under the ESA.  It is a major flaw in the Plaintiffs' argument to assume that the project will destroy or adversely modify the Florida Panther's "critical habitat" when it has not been determined that this particular site is a critical habitat.  The land included in the HPP's recommendation for a critical habitat designation area is not anywhere in Sarasota County.  In addition, the Walton Tract has not been identified as a reintroduction site for Florida Panthers, nor is it adjacent to any such sites.  *See* F.W.S. Opinion at 20-21.  Because the Walton Tract is not in proximity to areas of known Florida Panther use, it does not possess an important characteristic of areas suitable for Florida Panther reintroduction.

In summary, because the Recovery Plan is not a document with the force of law divesting all discretion and judgment from the F.W.S., and because the F.W.S. identified reasonable justifications for issuing "no jeopardy" Biological Opinions with respect to the Walton Tract, we hold that the Plaintiffs have failed to meet their burden of demonstrating that the F.W.S. acted arbitrarily and capriciously by issuing the Opinions.  Likewise, we hold that the Plaintiffs have failed to show that the Corps acted arbitrarily and

---

[16]The HPP was developed and approved in November, 1993, to implement the Florida Panther Recovery Plan.

capriciously by relying on these Opinions when consultation with the F.W.S. is exactly what is required by the relevant statutory scheme.

*D. Disallowing Discovery*

At oral argument on the cross-motions for summary judgment, the Plaintiffs presented a government document demonstrating contact between Senator Bob Graham and the United States Department of Justice. The document is a memorandum providing an account of a meeting that was held between the Corps and Sarasota County during the time that the landfill permits were suspended while the F.W.S. and the Corps completed the new § 7 consultation that was initiated as a result of the Plaintiffs' lawsuit. The memorandum states that Senator Graham "had contacted the Attorney General" with regard to the litigation, and that "Sen. Graham was working to see if [the Department of] Justice would withdraw [a] recommendation" that a draft environmental assessment be made available for public comment. *See* # A.R. Tab 137. At oral argument, the Plaintiffs' counsel brought this document to the attention of the district court and requested that, should the court deny the Plaintiffs' motion for summary judgment, the Plaintiffs be permitted to take discovery on the extent to which Senator Graham's involvement may have influenced the agencies' decisions in this case, particularly the Corps' decision not to prepare an environmental impact statement. The district court denied this discovery request. The Plaintiffs claim that this denial was improper. We conclude that the district court's order denying discovery must stand because it was not an abuse of

discretion.

None of the cases upon which the Plaintiffs rely provides a basis for permitting discovery on the issue involving the memorandum from Senator Graham. For example, in *ATX, Inc. v. United States Department of Transportation,* 41 F.3d 1522, 1527 (D.C.Cir.1994), members of Congress strongly voiced opposition to ATX's airline application to the Department of Transportation ("D.O.T."). Several members of Congress wrote letters directly to D.O.T. Secretary Federico Pena urging him to deny the ATX application, and the record contained letters from over 125 members of Congress to other transportation department officials. *Id.* In holding that the congressional pressure was insufficient to invalidate D.O.T.'s adjudication, the D.C. Circuit noted that " "the proper focus is not on the content of congressional communications in the abstract, but rather upon the relation between the communications and the adjudicator's decision-making process.' " *Id.* (citation omitted). There, as here, "congressional input neither created an appearance of impropriety nor actually affected the outcome." *Id.* As discussed in Section IV.B of this opinion, it is clear that the Corps' decision not to complete an environmental impact statement was based on the merits of this case. Furthermore, the legal issue raised in the controversial memorandum—whether to circulate a draft environmental assessment for public comment—is irrelevant. Even if such a recommendation had been made and withdrawn, there is no *legal* requirement that an environmental assessment be circulated publicly and, in fact, they rarely are. Thus, the district court did not

abuse its discretion when it disallowed discovery on this issue.

## V. CONCLUSION

Based upon the foregoing, we hold that the Corps and the F.W.S. did not act arbitrarily and capriciously in any of their decisions in this case, and that the district court did not abuse its discretion in disallowing discovery on the issue involving the memorandum from Senator Graham. Accordingly, we affirm the district court's grant of summary judgment in favor of the Defendants. Nevertheless, we are remanding the case to the district court to enable the court to resolve a motion pending before it.[17] In light of the limited purpose of this remand, we see no need to assign this case to a different judge on remand. Accordingly, the Plaintiff's request for reassignment is denied. *See United States v. Torkington,* 874 F.2d 1441, 1447 (11th

---

[17]As we understand it, currently there is a motion pending in the district court to delete the first footnote in its October 12, 1995 Order. We remand this case for the limited purpose of enabling the district court to resolve this motion. We are disturbed by the language contained in the disputed footnote. *See* District Court Order at 1 n. 1. As discussed above, the Plaintiffs requested at oral argument that they be permitted to take discovery on the issue of whether Senator Bob Graham had improperly intervened on behalf of the County. This request was supported by a memorandum the Plaintiffs presented that stated that Senator Graham was "working to see if" the Justice Department would withdraw a recommendation that an environmental assessment be publicly circulated. The district court engaged in a harsh rebuke of the Plaintiffs' counsel for even making this discovery request, calling it a "defamation of Senator Graham" and indicating that counsel would be held in contempt if she continued. Our careful review of the record persuades us that this language was unwarranted and completely unnecessary to the district court's disposition of this case. The Plaintiffs' counsel was wholly within her rights in this case to request discovery on the issue of Senator Graham's involvement. Because there is a motion pending before the district court, we direct the district court to take a second look at the footnote and consider deleting it.

Cir.1989) (identifying elements to be considered in determining whether to reassign a case to a different judge).

AFFIRMED and REMANDED.