**T.H. AGRICULTURE & NUTRITION, L.L.C., Plaintiff,**

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and Carol M. Browner, in her official capacity as Administrator of the United States Environmental Protection Agency, Defendants.**

**No. 1:96–CV–193–1 WLS.**

United States District Court,

**1368**

M.D. Georgia,
Albany Division.

March 31, 2000.

Rita A. Sheffey, Edwin Williamson, Atlanta, GA, for Plaintiff.

William David Gifford, Macon, GA, Stephen R. Herm, Lee Tyner, Washington, DC, Paul Schwartz, Atlanta, GA, for Defendants.

## ORDER

SANDS, District Judge.

Presently pending before the Court is Plaintiff's Motion for Summary Judgment (Doc. No. 23); and Defendants' Motion for Summary Judgment (Doc. No. 26). For the following reasons, the Court finds that Plaintiff's Motion for Summary Judgment should be denied and Defendant's Motion for Summary Judgment should be granted.

## FACTS

Based on the parties' respective statement of facts, the Court finds the following: As of 1967, T.H. Agriculture and Nutrition, L.L.C. ("THAN") owned a parcel of property at 1401 Schley Avenue in Albany, Georgia ("Site"). From the mid–1950s to the late 1970s, the THAN Site was used as an agricultural chemical formulation and packaging plant. From 1982 until 1989, THAN conducted several investigations to determine the nature and extent of the potential contamination and conducted a preliminary removal action under the supervision of the Georgia Department of Natural Resources Environmental Protection Division. In March of 1989, the Environmental Protection Agency ("EPA") placed the THAN Site on the National Priorities List. On July 6, 1990, THAN and EPA entered into an Administrative Order by Consent with EPA for the performance of a Remedial Investigation/Feasibility Study ("RI/FS") at the Site. In discussions between THAN and EPA, the EPA in-

formed THAN that using fate and transport computer models such as PESTAN Model ("PESTAN") and the Summers Mass Balance Model may be an option to determine the site specific soil action levels (SALs) and whether the contamination in subsurface soil was leaching into groundwater at levels which would exceed the applicable standards. THAN undertook such studies and concluded from its investigation that the chemical constituents in the subsurface soil were not leaching into the groundwater at levels that would cause the groundwater to exceed applicable cleanup standards.

On February 14, 1992, THAN proposed an "immediate removal action" as the "most cost-effective and promptest means of eliminating soil contamination at the property." Def.'s Br. Supp. Cross Mot. Summ. J, Ex. B(Letter from James D. Levine, Counsel to THAN, to Alan Yarbrough, EPA Remedial Project Manager for the Site, at 4 (February 18, 1992) (hereinafter "February 18, 1992, Correspondence")). THAN proposed to excavate and dispose of surface soils on the Site to a depth of one foot for surface soils that exceeded approximately 12 parts per million (ppm) of total organochlorine pesticides (OCPs). Id. at 2. THAN further proposed to excavate and dispose of soils deeper than one foot based on the subsurface computer modeling THAN used in the RI/FS for the Site. Any "hot spots" of severe contamination would also be alleviated. This proposed action involved disposing of approximately 14,000 tons of contaminated soil and materials. Id. THAN asserted that by undertaking its proposed removal action, it would "eliminate the major ongoing contamination source on the property." Id. at 2. THAN stated that although it would prefer to undertake this cleanup pursuant to a consent order with EPA and under EPA oversight, it was prepared to proceed with the proposal as a voluntary measure without EPA's agreement. Id. at 5–6. THAN wanted to ensure their proposed removal action would be approved in time for THAN to complete the work by May 1, 1992.[1] Id. at 1.

On March 3, 1992, the EPA responded that it had several concerns regarding THAN's proposal, but found that so long as the concerns would be resolved, the proposed removal action would be consistent with an ultimate remedy at the Site and could be justified on environmental grounds. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. C (Letter from Alan Yarbrough to John Cleary, Project Manager at THAN, at 1–2 (March 3, 1992) (hereinafter "March 3, 1992 correspondence")). Accordingly, the EPA found the proposal could be conditionally approved, based on four caveats. Id. at 2. In particular, this included the provision that the removal action was at THAN's risk, stating that the EPA would not guarantee that the removal cleanup levels would correlate with the remedial cleanup levels since such remedial cleanup standards would not be determined until a ROD was signed concerning the soils operable unit for the Site. Id. at 2–3. Included with the letter was a draft consent order for the removal action to be conducted under the oversight of the EPA.

EPA's On–Site Coordinator ("OSC"), Don Rigger, inquired as to whether EPA had established clean-up levels for on-site soil at the Site, to which the Remedial Project Manager informed the OSC that it had not. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. F (Letter from Douglas F. Mundrick, Chief of the South Superfund Remedial Branch, to John P. Cleary, Project Manager of THAN at 2 ("April 27, 1992, Correspondence")). Although THAN submitted its proposed clean-up levels, these had not yet been conclusively approved by the EPA. Accordingly, the OCS was responsible for establishing the cleanup level for the removal action which would be protective of human health. Id. The OCS set the cleanup level to 50 ppm

---

1. Specifically, THAN proposed this date so it might dispose of the 14,000 tons of contami-

nated soil under a national capacity variance that would expire on May 8, 1992.

for surface soil and 100 ppm for subsurface soil, based upon a survey of other sites in the region with similar contaminants. *Id.* at 3. This survey is documented in handwritten notes, which were supplemented to the record at a later date. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. G, Notes Accompanying Memorandum from Don Rigger, OSC, to Debbie Jourdan, Administrative Record Coordinator (Mar. 6, 1995) ("Rigger's Survey"). Along with the handwritten notes of the survey were memoranda by Agency for Toxic Substances and Disease Registry ("ATSDR") stating that the 100 ppm is a cleanup level protective of human health. *Id.*

In a memorandum dated March 17, 1992, the OSC summarized both THAN's and EPA's respective proposals and requested comments from ATSDR on the proposed removal action levels. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. H (Memo from Don Rigger, OSC, to Bob Safay, ATSDR Regional Representative, dated March 17, 1992). On the same day, THAN was also notified as to the proposed cleanup level the OSC suggested (50 ppm for surface soil and 100 ppm for subsurface soil). On March 20, 1992, ATSDR responded in writing to the two proposals, stating that it could not determine whether THAN's proposal would be protective of human health until OCP levels were known at the depth of 1 to 5 feet. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. I (ATSDR Record of Activity). ATSDR specifically noted concern over whether unknown levels of OCP could be brought to the surface for direct contact exposure through activities like on-site construction or laying utility lines. *Id.* However, the report did find that the EPA's proposed removal action levels would be protective of human health for most industrial and commercial uses.

On March 30, 1992, EPA issued a Unilateral Administrative Order ("UAO"), including the requirement for THAN to excavate all subsurface soil for depths in excess of one foot to a maximum pesticide level not to exceed 100 ppm. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. E ("UAO"). Pursuant to the requirements of

the UAO, THAN notified the EPA of its irrevocable intent to comply with the UAO by letter dated April 1, 1992 (AR 10.11.2). On April 6, 1992, THAN submitted formal objects to the EPA's UAO, specifically objecting to the 100 ppm level set for subsurface soil as arbitrary, capricious, and without justification. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. D. (Letter from James Levine to Greer Tidwell, Regional Administrator of the EPA ("April 6, 1992, Correspondence")). THAN also asserted that the EPA should have used the computer modeling performed by THAN during the remedial process. EPA relied in writing to each issue THAN raised, noting that the EPA set such a level to ensure protection for a direct contact exposure scenario. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. F (Letter from Douglas F. Mundrick, Chief of the South Superfund Remedial Branch, to John P. Cleary, Project Manager of THAN ("April 27, 1992, Correspondence")). THAN completed the requirements ordered in the UAO on January 13, 1994. On February 10, 1994, THAN submitted a Final Action Report to the EPA, summarizing the actions taken to comply with the UAO. On March 23, 1994, the EPA notified THAN by letter that it had satisfactorily completed the removal action required by the UAO.

On October 9, 1996, after completing all necessary prerequisites, THAN filed the current motion, disputing whether the EPA should have ordered THAN to comply with the EPA's determination of the subsurface soil cleanup level, rather than subsurface cleanup level suggested by the fate and transport modeling. THAN asserts that it spent a total of $5,582,103.00 to comply with the EPA's Order. Of this amount, THAN asserts that $1,752,673.00 is attributable to the EPA's allegedly arbitrary decision regarding the subsurface soil cleanup level. THAN files the current motion for summary judgment, seeking reimbursement for the $1,752,673 incremental cost directly attributable to EPA's "arbitrary and capricious order." Brief at 3.

Defendant in response files a cross summary judgment motion.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court is required to "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (quotations and citations omitted).

The moving party carries the initial burden of showing that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The substantive law governing the case determines which facts are material, and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). For issues on which the non-movant bears the burden of proof at trial, the moving party "simply may show—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case." *Fitzpatrick,* 2 F.3d at 1116 (quotations and citations omitted).

If the moving party fails to overcome this initial burden, the Court must deny the motion for summary judgment without considering any evidence, if any, presented by the non-moving party. *Fitzpatrick,* 2 F.3d at 1116. If, on the other hand, the moving party overcomes this initial burden, then the non-moving party must show the existence of a genuine issue of material fact that remains to be resolved at trial. *Id.* Moreover, the adverse party may not respond to the motion for summary judgment by summarily denying the allegations set forth by the moving party. Rather, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

### II. ANALYSIS

THAN filed the current action, seeking reimbursement for response costs it incurred in cleaning up and disposing of hazardous substances. *See* 42 U.S.C. § 9606. Pursuant to section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") of 1980, the EPA ordered THAN to conduct removal actions to alleviate "an imminent and substantial endangerment to the public health, welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Site." THAN complied with this order, but believed the order was flawed. After petitioning the EPA for reimbursement of its cleanup costs by the reasonable costs incurred, which the EPA refused, THAN filed the current action in this Court.[2] *See* 42 U.S.C. § 9606(b)(2)(A)-(B). Section 106(b) entitles a party to challenge whether said party should be liable for the response costs, or, if one is liable, the party may challenge whether the order was arbitrary and capricious. *See* 42 U.S.C. § 9606(b)(2)(C)-(D). While THAN concedes that it is the responsible party in this action, it contends that the EPA's

---

2. THAN asserts that it complied with all necessary prerequisites to filing the suit in district court. The EPA does not dispute this contention.

order was arbitrary and capricious. *See* Pl.'s Mem. Supp. Pl.'s Mot. Summ. J. (Pl.'s Mem.) at 6. To prevail in this claim, THAN must show that, on the administrative record, the EPA's order in selecting the response action ordered was "arbitrary and capricious or was otherwise not in accordance with law." 42 U.S.C. § 9606(b)(2)(D).

The scope of review under the "arbitrary and capricious" standard is narrow. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (citations and internal quotation marks omitted). This standard is exceedingly deferential. *Fund for Animals, Inc. v. Rice,* 85 F.3d 535, 541 (11th Cir.1996). While a reviewing court is not to substitute its judgment for that of the agency, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136, 152 (1971), it must also not simply "rubber stamp" the agency's decision. To determine whether an agency decision was arbitrary and capricious, the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations and internal quotation marks omitted). With this in mind, the Court turns to the administrative record.

THAN asks this Court to review the EPA's decision-making process to determine if the EPA failed to consider factors relevant to its decision and whether the administrative record contains factual support for its contentions. Specifically, THAN asserts that the Administrative Record (AR) did not contain sufficient information to justify rejecting THAN's proposal and requiring an "across-the-board" 100 ppm cleanup level for the subsurface soil, but merely relied on an informal survey of other sites and the ATSDR's concurrence in the EPA's plan.

THAN first argues that the Court should give little or no weight to the one page handwritten survey of other sites and its attached memoranda. THAN appears to challenge the validity of the notes and asserts the Court should not give any credit to notes which surfaced three years after the EPA's decision. Pl.'s Reply at 7. THAN asserts that the notes do not indicate who conducted the informal survey, when it was conducted, whether the notes fully reflect the results, or how the EPA determined the other sites were similar to THAN's property, if such a determination was made. THAN further objects to this survey because it was not given a copy of the survey at the time of the EPA's decision so it could challenge the applicability of the other sites. Pl.'s Reply at 11.

According to the EPA, the OSC initially proposed a 50 ppm surface and 100 ppm subsurface clean-up level for the Site based on a survey of prior removal actions with similar contaminants in a similar condition. Def.'s Ex. F. at 3. (April 27, 1992, Correspondence). The EPA has represented to this Court that the notes concerning a survey of other sites were a part of the administrative record but were inadvertently omitted. The disputed survey represents the agency's experience and expertise in responding to six other sites with similar contaminates in the same region. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. G. The contested survey includes memoranda attached, expressing that the ATSDR has found the level of 100 ppm of total chlorinated pesticides as protective of human health as to other sites, thus demonstrating that the agency had prior knowledge that the ATSDR found this level as acceptable. *Id.,* at 4 (Letter regarding Chem–Spray Site).

Upon review of the AR, THAN was informed the EPA was using their expertise and experience in other sites when reviewing THAN's Site. An agency may rely on its prior experience and expertise—knowledge which is not always a matter capable of documentary evidence which would be generally found in an AR. While a court should not rubber stamp a decision simply because an agency asserts

that it relied on its expertise and experience in an area, a court should "give due deference to the agency's ability to rely on its own developed expertise." *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 905 (5th Cir.1983). This Court will not merely substitute its own judgment for that of the agency, but will defer to the agency's experience provided that "the agency has offered a reasoned explanation for its decision, and that the result is in accord with material facts contained in the administrative record." *DSE, Inc. v. U.S.,* 169 F.3d 21, 30 (D.C.Cir.1999); *see also United States v. Akzo Coatings,* 949 F.2d 1409, 1434 (6th Cir.1991) (finding that an agency may rely on its experience at other sites).

▮▮▮▮ THAN also contends that because the EPA's decision was consistent with other sites in the informal survey, the agency set a standard without promulgating and publishing a rule. Pl.'s Br. Supp. Summ. J. at 13. The Court finds such a contention without merit. Consistency differs greatly from setting a standard which has the force of law, a standard which would not allow for deviations. The Court does not find that when an agency is consistent with other decisions it made at prior sites, that the agency has set a standard. Instead, a court should give more deference to an agency decision when the agency's decision fits with a policy the agency has consistently followed. *See, e.g., A & W Smelter and Refiners, Inc. v. Clinton,* 146 F.3d 1107, 1112 (9th Cir.1998). The administrative record demonstrates that the agency sought information to indicate whether applying its typical cleanup level would be justified at this site. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. H (Memo from Don Rigger, OSC, to Bob Safay, ATSDR Regional Representative, dated March 17, 1992). After the clean-up level was proposed, the agency still submitted its plan and THAN's plan[3] and site-specific information to the ATSDR for

its analysis as to whether either plan would be protective of human health. This demonstrates that the agency was not setting a rule or standard without considering the facts specific to this site. Instead, it suggested a certain level of clean-up based on its prior experience and then sought out additional information to determine whether *either* plan would protect human health. That the EPA was consistent with its prior sites only furnishes confidence as to its decision-making process in the case at hand.

THAN also takes issue with the ATSDR's report, asserting that the ATSDR's concurrence with the EPA's decision does not provide a rational basis for the EPA's requirement that THAN ensure soil between one to five feet beneath the surface meet the 100 ppm cleanup level. Plaintiff first asserts that the concurrence is not persuasive because it came one day after the EPA's made its proposed cleanup level. This argument is meritless. THAN is not asserting that the EPA was bound by its initial proposal. Instead, the record refutes such a theory. As stated above, the EPA sought review of both THAN's and its own proposal. It notified THAN of its proposal weeks before it issued the UAO, which was not issued until March 30, 1992. Simply because the EPA announced its proposal before the ATSDR Report was returned to the EPA does not mean that this concurrence should be ignored.

THAN asserts that the ATSDR plan did not decide whether THAN's proposal would be protective of human health because it did not have sufficient information and argues that EPA's decision was excessive of protecting human health. The Court notes that even under EPA's proposal, the ATSDR noted that the property would not be able to be used for any purpose, certain uses of the property would create increased health risks.

---

**3.** THAN also objected to how the EPA submitted its plan to ATSDR, asserting that EPA did not include information presenting THAN's computer modeling data to ATSDR. Such

modeling data addressed possible groundwater contamination and not direct contact with soil contamination, which was ATSDR's area of expertise.

THAN's main objection to the EPA's Order centers around EPA's selected maximum total pesticide level of 100 ppm for soil located between one-to-five feet under the surface and its contention that the EPA ignored THAN's computer modeling which showed that groundwater contamination was unlikely.[4] The EPA does not have to prove whether it selected the best possible response, or whether another response would also have been an acceptable selection—it simply cannot act arbitrarily in making its decision. Upon review of the administrative record, the Court notes that the ATSDR found that 100 ppm would be a clean-up level protective of human health. Further, ATSDR found that THAN's proposal may not be protective because soil at the 1 to 5 foot level. The EPA asserted from the beginning that it chose the proposal it did because the soil needed to be protective of human health for direct contact as subsurface soil could be brought back to the surface due to construction onsite or laying utilities lines through the site. Then "unknown concentrations of OCP may be brought to the surface for direct contact exposure." THAN's own suggested plan proposed to excavate the surface soil (the first foot of soil) to limit pesticide concentrations well under 50 ppm. Def.'s Br. Supp. CrossMot. Summ. J., Ex. D. at 4. (Letter from James Levine to Greer Tidwell, Regional Administrator of the EPA ("April 6, 1992, Correspondence")). Further, based on THAN's initial proposal which was later adopted, THAN excavated identified "hot spots" of more severe contamination until the remaining pesticide concentrations in the areas were less than 50 ppm. *Id.* at 3. (April 6, 1992, Correspondence). For all other sub-surface soil, THAN would use computer modeling to establish subsurface clean-up levels, a method that only reviewed the possibility of contaminating the groundwater. As noted above, this computer modeling was to establish how likely the remaining contaminants could leak into the groundwater, focusing on groundwater as the principle method of human exposure to the contaminants as the method of contact. *Id.* at 3. Although the Court notes that THAN's position was always that the 50 ppm were set above standard, the 100 ppm level for direct contact, was twice that of what it contained in its initial plan. For THAN to summarily assert that 100 ppm level at 1–5 feet was arbitrary and capricious goes against its very plan, which initially proposed a 50 ppm level for soil coming into direct contact with people—that at the level of 1–5 feet.

▇ Upon a review of the cross motions for summary judgment, the Court finds that the EPA's decision was not arbitrary or capricious. The EPA relied on its prior experience with similar sites in its initial proposal of its plan. Moreover, after this initial selection, the agency submitted both plans to the ATSDR. After the ATSDR reviewed both THAN's plan and the EPA's plan, it found that it could not determine whether THAN's plan would protect human health because the level of OCPs at the 1 to 5 foot depth was unknown. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. I. The ATSDR did find the EPA's proposal would be protective of human health for industrial use and most commercial uses. *Id.* Even under the EPA's plan, however, ATSDR noted that the property's future use would be limited, posing the possibility of long-term health concerns under certain conditions where contaminated soil would come in contact with people, such as if the site became a residential area, playground, or children's day care center. *Id.* This contradicts THAN's assertion that the EPA arbitrarily chose a higher than necessary cleanup level. The Court also notes that the Administrative Record clearly shows THAN was able to evaluate and respond to the EPA's decision and indeed did so respond

---

4. THAN also asserts that EPA's alleged lack of time does not justify an otherwise arbitrary and capricious decision. As the Court finds that the decision was not arbitrary and capri-

cious, there is no reason to address whether the EPA perceived a deadline which created a poor record upon which to rely.

in a detailed 9–page letter criticizing the EPA's decision. Def.'s Br. Supp. Cross-Mot. Summ. J, Ex. D. at 4. ("April 6, 1992, Correspondence"). The EPA addressed this letter in full, responding to each of THAN's concerns. Def.'s Br. Supp. Cross Mot. Summ. J, Ex. F (Letter from Douglas F. Mundrick, Chief of the South Superfund Remedial Branch, to John P. Cleary, Project Manager of THAN ("April 27, 1992, Correspondence")).

Upon review of the record and arguments submitted, the Court does not find that THAN has supported its burden to show that the EPA failed to consider relevant factors or made a clear error of judgment or that the EPA's decision was not in accordance with the law. From the record it appears that the agency did examine the relevant data, including site specific data, and articulated a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245–246, 9 L.Ed.2d 207 (1962).

## CONCLUSION

Therefore, for the reasons mentioned above, the Court finds Plaintiff's Motion for Summary Judgment (Doc. No. 23) should be, and hereby is **DENIED** and Defendants' Motion for Summary Judgment (Doc. No. 26) should be, and hereby is, **GRANTED**. The Court **DIRECTS** the Clerk of the Court to **ENTER JUDGMENT** in favor of **DEFENDANT**.