**BIODIVERSITY LEGAL FOUNDATION, et al., Plaintiffs,**

v.

**Gale NORTON, et al., Defendants.**

**No. CIV.A.00–3030(RMC).**

United States District Court, District of Columbia.

Sept. 30, 2003.

Eric Robert Glitzenstein, Meyer & Glitzenstein, Washington, DC, Daniel Ryan Vice, Brady Center, Washington, DC, for plaintiffs.

S. Jay Govindan, Matthew Love, U.S. Department of Justice, Environmental Division, Washington, DC, Bridget L. McNeil, U.S. Department of Justice, Washington, DC, for defendants.

## MEMORANDUM OPINION

COLLYER, District Judge.

This lawsuit, brought under the Endangered Species Act, 16 U.S.C. § 1531 *et seq.* ("ESA"), and the unreasonable delay provisions of the Administrative Procedure Act, 5 U.S.C. §§ 555(b), 706(1) ("APA"), puts the Secretary of the Interior, Gale Norton, between the proverbial rock and a hard place. Three individuals and two environmental groups, led by Biodiversity Legal Foundation (collectively, "Foundation"), complain that the United States Department of Interior ("DOI") and the United States Fish and Wildlife Service (collectively, "FWS" or "Service") have failed to revise the "critical habitat designation" of the Cape Sable seaside sparrow,[1] despite finding on October 23, 2001, that such a revision is warranted and despite twenty years of agency studies to the same effect. FWS agrees that revising the bird's critical habitat designation "would be a good thing." Defs. Reply at 4. The Service advises the Court that chronic underfunding by Congress and outstanding court orders and settlements from other lawsuits preclude immediate action, but promises that it will revise this critical habitat designation "as soon as feasible,"

given these constraints. Not satisfied with this response, the Foundation sues to force FWS to propose and carry out such a revision in accordance with a strict timetable to be imposed by the Court. Citing the Service's own studies, the Foundation fears that the seaside sparrow will become extinct before FWS devotes sufficient resources to this important task.

Pending before the Court are the parties' cross motions for summary judgment. The Foundation seeks judgment in its favor as to (1) FWS's violation of section 4 of the ESA based on the Service's publication of an allegedly-deficient finding under 16 U.S.C. § 1533(b)(3)(D)(ii) ("12–Month Finding"); (2) FWS's reliance on its Listing Priority Guidance ("LPG"); and (3) FWS's delay in revising the seaside sparrow's critical habitat designation. FWS counters that (1) the 12–Month Finding fully complies with the ESA section 4 requirement that the Service publish "how [it] intends to proceed with the requested revision[;]" (2) FWS did not actually rely on the LPG in making the 12–Month Finding; and (3) there has been no unreasonable delay in proposing a rule to revise the critical habitat designation.[2]

The Court finds that the ESA grants FWS discretion as to revising a critical habitat designation, but that the APA requires reasonable timeliness once an obligation to undertake a revision attaches. The Court also concludes that the Foundation's LPG claim is moot. Under these circumstances, as described below, the Court recognizes the Service's continuing discretion within a very small window.

---

1. For purposes of this memorandum opinion, the terms "seaside sparrow," "sparrow," or "bird," unless otherwise indicated, refer to the Cape Sable seaside sparrow.

2. FWS initially argued that the Foundation had not established standing under Article III of the United States Constitution. "Based on the declarations that have [since] been provided ... FWS does not [now] contest Plaintiffs' standing in this case." Defs. Reply at 5.

Four years have passed since FWS undertook to revise the seaside sparrow's critical habitat designation and the bird is close to extinction. In the context of this reality, the Service will be given 60 days to notify the Court of a specific schedule to revise this critical habitat designation. Accordingly, the Foundation's renewed motion for summary judgment will be denied in part and FWS's cross motion will be granted in part. The Court will retain jurisdiction over this matter to ensure FWS is proceeding diligently. Given the disposition of these cross motions, FWS's motion for reconsideration will be denied as moot.

## I. BACKGROUND

### A. Statutory Framework

The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (quoting *TVA v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)) (internal quotation marks omitted). Enacted by Congress in 1973, the statute aims "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species ...." 16 U.S.C. § 1531(b).

Section 4 of the ESA directs FWS to determine by regulation whether any species is endangered or threatened.[3] 16 U.S.C. § 1533(a)(1). An endangered species is one that "is in danger of extinction throughout all or a significant portion of its range." *Id.* §§ 1532(6). There is no dispute in this case that the Cape Sable seaside sparrow is endangered and was properly placed on the Endangered Species List in 1967.

Listing a species as endangered only begins the process of working for its survival and recovery. As amended, the ESA now requires that, if FWS determines that a species is endangered under ESA section 4(a)(1), it must concurrently "designate any habitat of such species which is then considered to be critical habitat." *Id.* § 1533(a)(3)(A).

The term "critical habitat" for a threatened or endangered species means -

(i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 4 of this Act, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 4 of this Act, upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A).

The Secretary shall designate critical habitat, and make revisions thereto, under subsection (a)(3) on the basis of the best scientific data available and after taking into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat. The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclu-

---

**3.** The Secretary of the Interior has delegated to FWS responsibility for administering these aspects of the ESA. 50 C.F.R. § 402.01(b).

sion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned. *Id.* § 1533(b)(2).

Endangered species are entitled to significant protection under the ESA. Section 9 makes it unlawful for any person to "take" such a species. 16 U.S.C. § 1538(a)(1)(B). The term "take" is defined very broadly to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[4] 16 U.S.C. § 1532(19). In addition, endangered species are safeguarded by the section 7 requirement that all other federal agencies "shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species ... or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2).

Section 4 of the ESA provides two methods for revising a critical habitat designation. FWS "may, from time-to-time ... as appropriate, revise [the critical habitat] designation" of an endangered species. *Id.* § 1533(a)(3)(B). Any "interested person" may also petition FWS to make such a revision. *Id.* § 1533(b)(3)(D); 50 C.F.R. § 424.14. Once a petition is submitted by an interested person, "[t]o the maximum extent practicable," the Service has 90 days to issue "a finding as to whether the petition presents substantial scientific information indicating that the revision

may be warranted." 16 U.S.C. § 1533(b)(3)(D)(i). If FWS decides in the affirmative, then it "shall determine how [it] intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register." *Id.* § 1533(b)(3)(D)(ii). This determination must be made within 12 months after receiving a petition, regardless of when FWS made its finding under section 4(b)(3)(D)(i) ("90–Day Finding"). *Cf. Biodiversity Legal Found. v. Babbitt*, 63 F.Supp.2d 31, 34 (D.D.C.1999).

"[T]he Service has issued a series of Listing Priority Guidance ('LPG') documents over the years, pursuant to its authority under ESA section 4(h)." Defs. Cross Mot. for Summ. J. and Opp. at 7 ("Defs.Motion"). That section requires FWS to "establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively." 16 U.S.C. § 1533(h). "The overriding goal of the LPGs was to set up a biologically-based system to prioritize the various listing activities to secure the most protection for the greatest number of imperiled species. In accordance with Section 4(h), the LPG[s] are adopted after a public notice and comment period." Defs. Motion at 7–8 (citation omitted).

### B. Cape Sable Seaside Sparrow

The Cape Sable seaside sparrow is a medium-sized sparrow, about five inches long. Arthur Howell discovered the bird in 1918 on Cape Sable, which is located in southwest Florida. *The Cape Sable Seaside Sparrow: An Endangered Bird in a Vulnerable Landscape*, A.R. Vol. 8, Doc. II–10, at 5. As a result of hurricanes in 1935 and 1960, which helped change the

---

**4.** FWS regulations define the term "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

vegetation in Cape Sable from freshwater to salt tolerant, reduced freshwater flows due to "upstream water management practices," and sea level rise, the Cape Sable seaside sparrow "no longer use[s] this area." [5] Multi–Species Recovery Plan for South Florida ("MSRP"), A.R. Vol. 2, Ex. 2, at 4–350. The seaside sparrow, which is non-migratory, has a "very restricted range" and lives today "in the Everglades region of Miami–Dade and Monroe counties in South Florida." *Id.; see The 2000 Cape Sable Sparrow Annual Report* (draft), A.R. Vol. 9, Doc. II–40, at 7 ("This federally listed sub-species currently exists within the protected lands of Everglades National Park ... and adjacent Big Cypress National Preserve.").

As this Court has already recognized, "the Cape Sable seaside sparrow is at significant risk of imminent extinction." [6] *Biodiversity Legal Found. v. Norton,* 215 F.Supp.2d 140, 141 (D.D.C.2002).

> The Cape Sable seaside sparrow has three population centers. One (Ingraham Highway) is healthy, but at risk due to fire and hurricane. The second (Western) is nearly lost, at only 10% of former levels. The third (Eastern) is at 50% of former levels, and not recovering .... If current trends continue, the Cape Sable seaside sparrow will likely be extinct within a few decades [of 1998].

*Balancing on the Brink: The Everglades and the Cape Sable Seaside Sparrow,* A.R. Vol. 5, Doc. 25, at 22.

Changes to the hydrology of the Everglades, caused in large part by the United States Army Corps of Engineers' Central and Southern Florida Project ("C & SF Project"), are a major reason for the seaside sparrow's decimation. *Id.* at 2. "The [C & SF Project], built primarily for flood control and water supply for the south Florida region, routes floodwaters directly over the Cape Sable seaside sparrow's western habitats and drains the eastern sparrow habitats .... This combination of flooding and overdraining destroys the sparrow's habitat." *Id.* at 2–5; *see Biodiversity Legal Found. v. Norton,* 180 F.Supp.2d 7, 8 (D.D.C.2001) ("These hydrology changes continue to represent the main threat to the overall survival of the species.").

## C. Factual History

FWS listed the Cape Sable seaside sparrow as endangered in 1967, 50 C.F.R. § 17.11, and designated its critical habitat in 1977, 50 C.F.R. § 17.95. Due to various changes in environment—*i.e.,* "drainage, hardwood invasion, [and] substrate alteration"—the Service concluded in 1983 that "the extent of current Critical Habitat requires review." Cape Sable Seaside Sparrow Recovery Plan, A.R. Vol. 6, Doc. 31, at 23, 33 ("The area included in the presently designated Critical Habitat of the Cape Sable seaside sparrow does not reflect current occupancy or needs of the sparrow."). Nonetheless, FWS did not revise the seaside sparrow's critical habitat designation at that time.

On April 10, 1995, Congress reduced the budget for FWS's listing program by $1.5 million. Pub.L. No. 104–6, 109 Stat. 73. "Pub.L. 104–6 prohibited the expenditure of the remaining appropriated funds for

---

5. "Unlike other races, which are confined to coastal salt marshes, the Cape Sable Sparrow occurs predominantly in inland freshwater marshes." *Habitat Use and the Distribution of the Cape Sable Sparrow,* A.R. Vol. 2, Ex. 6, at 139.

6. This case was assigned to the undersigned judge by the District Court's calendar committee on January 15, 2003. As of that time, Judge Ricardo M. Urbina, the previous presiding judge, had issued two memorandum opinions, including the one from which this quote originates.

final determinations to list species or to designate critical habitat which, in effect, placed a moratorium on those activities." 62 Fed.Reg. 55,268 (Oct. 23, 1997). This continued until April 26, 1996, when former President Bill Clinton approved the Omnibus Budget Reconciliation Act of 1996. By that time, however, "the Service faced an enormous backlog of species waiting for listing determinations." Defs. Motion at 13. FWS contends that funding by Congress in subsequent years has been insufficient "to totally eliminate the backlog." *Id.* at 14.

In 1998, FWS issued a draft revised Recovery Plan for the Cape Sable seaside sparrow as part of what would become the MSRP. This document again determined that "[t]he critical habitat, as designated, does not adequately account for the distribution of the present-day core subpopulations, or the areas necessary for the birds to maintain a stable population .... Thus, the extent of the critical habitat requires significant review and re-designation." Pls. Pet. for a Rule to Revise Crit. Hab., A.R. Vol. 1, Doc. 2, at 99 (quoting Draft MSRP). The next year, FWS issued the final version of the MSRP, which provided that the Service would

> *Review and revise the current critical habitat designation based on distribution surveys.* Presently designated critical habitat does not adequately encompass the areas occupied by core populations and must be re-evaluated. Critical habitat should, at a minimum, include habitat west of Shark River Slough that supports one of the two core subpopulations, and should include an analysis of wintering habitat requirements.

MSRP, A.R. Vol. 2, Ex. 2, at 4–368 (emphasis in original). FWS, however, did not implement this aspect of the MSRP.

In August 1999, frustrated by the Service's inaction on this issue, the Foundation submitted a 137–page citizen petition to revise the critical habitat designation for the Cape Sable seaside sparrow. A subsequent internal FWS memorandum, dated March 23, 2000, stated:

> Based on the best scientific information available, we find the petition presents substantial information that revision of critical habitat for the sparrow may be warranted. Available information and data indicate that the marl prairie habitat areas along the western flank of Shark Slough are essential to the survival and recovery of the sparrow.

A.R. Vol. 7, Doc. 7, at 29. This memorandum became the basis for a one and one-half page 90–Day Finding that FWS published in the Federal Register on July 10, 2000, almost a year after the citizen petition was filed. 65 Fed.Reg. 42,316 (July 10, 2000) ("[T]he petition presents substantial information that revision of critical habitat for the Cape Sable seaside sparrow may be warranted.").

In September 2000, the Foundation sent FWS formal notice of its intent to sue "concerning [FWS's] failure to issue a timely '12–month finding' concerning whether it will revise the critical habitat designation for the highly endangered Cape Sable seaside sparrow[.]" Pls. Ren. Mot. for Summ. J. ("Pls.Motion") Ex. C. FWS responded by letter that it was "suspend[ing] work on th[is] finding" because outstanding court orders and settlements "will require [FWS] to spend its listing and critical habitat funding for fiscal year 2001, and [the Service] do[es] not anticipate additional funds becoming available until fiscal year 2002 or later."[7] *Id.* Ex.

---

**7.** According to FWS (as of the date of its cross motion):

In FY 2002, the Service was required to publish 62 court-ordered listing actions for

D. This not being the answer sought, the Foundation brought suit in federal court on December 20, 2000.

On August 30, 2001, after receiving the administrative record, the Foundation filed a motion for summary judgment. Instead of responding on the merits, however, FWS asked the Court to stay the briefing schedule because the Service was about to publish the 12–Month Finding. FWS assured the Court that the "notice which the Service has proposed will provide Plaintiffs with the relief they seek." Defs. Mot. for Stay of Briefing Sched. at 3.

On October 23, 2001, FWS published the 12–Month Finding in the Federal Register, concluding that "revision of critical habitat is warranted." 66 Fed.Reg. 53,573 (Oct. 23, 2001). The Service stated that it "will proceed with a proposal to revise critical habitat for the Cape Sable seaside sparrow as soon as feasible, considering [its] workload priorities and available funding." *Id.* Much to the Foundation's chagrin, "the Service's cursory Federal Register Notice set forth no concrete plan or timetable for actually accomplishing the admittedly necessary revision. Instead, the Service indicated ... that it would simply *return* the long-overdue revision to the back burner ...." Pls. Motion at 18 (emphasis in original).

The Court denied as moot FWS's motion to stay the briefing schedule on August 7, 2002. Expressing some disappointment with the substance of the 12–Month Finding, the Court held that the Foundation was "entitled to have the parties fully brief their cross-motions for summary judgment." *Biodiversity Legal Found. v. Norton,* 215 F.Supp.2d 140, 143 (D.D.C.2002). Thereafter, the Foundation filed a renewed motion for summary judgment and FWS filed a cross motion. These motions have now been fully briefed and are ripe for decision.

## II. STANDARD OF REVIEW

■ The Foundation sues under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g), and §§ 555(b) and 706(1) of the APA. These statutes provide access to the courts for different purposes. The ESA permits any person to commence a civil suit against FWS "where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary." 16 U.S.C. § 1540(g)(1)(C). A clearly-mandated, nondiscretionary duty must form the basis for such a suit. *Sierra Club v. Thomas,* 828 F.2d 783, 791 (D.C.Cir.1987) (analyzing a nearly-identical citizen suit provision in the Clean Air Act). "In order to impose a clear-cut nondiscretionary duty ... a duty of timeliness must 'categorically mandat[e]' that *all* specified action be taken by a date-certain deadline." *Id.* (quoting *NRDC v. Train,* 510 F.2d 692, 712 (D.C.Cir.1974)) (emphasis in original). In contrast, when a statute grants some degree of discretion to an agency as to the timing of a required

---

500 species. Furthermore, the Service required extensions for several FY 2002 court-ordered listing actions and anticipates publishing these 11 actions for 270 species in FY 2003. In FY 2003, with a yet-undefined budget appropriation, the Service must perform 49 court-ordered actions for critical habitat work involving 459 species. This work is in addition to the work the Service must perform on petitions to list or delist animals from the endangered or threatened list. So far in FY 2004, the Service must perform 24 critical habitat packages for 39 species in compliance with court orders. These actions will consume a significant portion of the FY 2004 budget and there will probably be more FY 2004 deadlines imposed on the Service as pending litigation is resolved.

Defs. Motion at 18 (citations to Second Declaration of Gary Frazer omitted).

action, thereby imposing "merely a 'general duty' of timeliness," suit should be brought as a claim for unreasonable delay under the APA. *Id.*

Under either statute, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is not a "disfavored legal shortcut[;]" rather, it is a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Laningham v. United States Navy,* 813 F.2d 1236, 1242–43 (D.C.Cir.1987).

## III. ANALYSIS

Through this lawsuit, the Foundation seeks to obtain more from FWS than what the 12–Month Finding contained. The Foundation claims entitlement to relief

both on the grounds that defendants remain in violation of section 4 of the ESA—because they have yet to announce how they intend to "proceed" with the designation of critical habitat—and because, by any rational measure, a nearly twenty-year failure to take a concededly necessary action to conserve a species that is already "balancing on the brink" of extinction constitutes "unreasonable" delay, in violation of the [APA], especially where defendants have made clear that, left to their own devices, they have no intention of taking the action any time in the foreseeable future.

Pls. Opp. and Reply ("Pls.Reply") at 2 (citations omitted).

### A. Endangered Species Act

#### 1. Section 4(b)(3)(D)(ii)

The primary issue underlying the Foundation's ESA claim is whether FWS's obligation under section 4(b)(3)(D)(ii) to state "how [it] intends to proceed with the requested revision" creates a nondiscretionary duty to include in the notice, at a minimum, a "specific schedule and process that the agency will follow in actually 'proceeding' with the needed revision." [8] Pls. Motion at 27.

As an initial matter, the parties argue vigorously over how much deference the Court should give to FWS's interpretation of ESA section 4(b)(3)(D)(ii). The Service asserts that the 12–Month Finding fully comported with the requirements of the statute and that, based on its longstanding reading of this provision and the issuance of Petition Management Guidance ("PMG") in 1996, its construction is enti-

---

8. The Foundation asks the Court to afford considerable weight to Judge Urbina's statement that the 12–Month Finding "does nothing to delineate how the FWS 'intends to proceed with the requested revision.'" *Biodiversity Legal Found. v. Norton,* 215 F.Supp.2d 140, 142 (D.D.C.2002). This statement, however, was not a ruling on the mer-

its. In the same opinion, Judge Urbina ordered full briefing, specifically noting that he took "no position at this juncture on whether any of the plaintiffs' claims might be moot, but anticipate[d] addressing these issues after the parties have fully briefed them in their cross-motions for summary judgment." *Id.* at 143 n. 1.

tled to deference under *Chevron U.S.A. Inc. v. NRDC, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), or—at the least—respect under *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).[9] *See Babbitt v. Sweet Home Chapter of Communities for a Greater Oregon,* 515 U.S. 687, 708, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). The Foundation contends that *Chevron* does not apply because the PMG "never adopted any such construction[,]" but merely tracked the language of the statute; consequently, "FWS has never adopted an official interpretation of this provision" as relevant to the ESA claim. Pls. Reply at 19; Pls. Motion at 21. For this reason, the Foundation argues that "the Court's role is to make its own determination of the 'best reading' of the provision." Pls. Motion at 21.

The Court need not delve into the intricacies of the *Chevron* doctrine and the PMG because, even under the less-deferential *Skidmore* analysis or the Court's own determination, FWS's interpretation is correct in that the 12–Month Finding satisfied the requirements of ESA section 4(b)(3)(D)(ii).

"It is axiomatic that statutory interpretation begins with the language of the statute itself." *Center for Science in Public Interest v. Regan,* 802 F.2d 518, 521 (D.C.Cir.1986). By its terms, ESA section 4(b)(3)(D)(ii) states that, within 12 months after receiving a petition to revise a critical habitat designation of an endangered species, FWS shall promptly publish notice of "how [it] intends to proceed with the requested revision." Nothing in this provision explicitly requires the Service to articulate a timetable for revising a critical habitat designation. Any such mandate, therefore, would have to arise from an interpretation of the statute's operative words.

Both parties agree that the terms in section 4(b)(3)(D)(ii) of the ESA should be read according to their "ordinary meaning." Pls. Reply at 13; Defs. Motion at 24. The Foundation argues that, "if [the term] 'proceed' is construed according to its 'ordinary meaning' ... then the statute requires defendants to at least publish a concrete plan that sets forth how and when the Service will actually 'undertake and carry on' the needed revision." Pls. Reply at 13 (quoting Webster's II New Riverside Dictionary (1988)). In fact, the Foundation contends that the 12–Month Finding actually indicates that the Service does *not* intend to proceed with the revision "within a time frame that has any rational relationship to the survival and recovery of [the Cape Sable seaside sparrow]." *Id.* The Foundation adds that FWS's approach to section 4(b)(3)(D)(ii) "renders both that section and *all* of the statutory provisions regarding citizen petitions to revise critical habitat completely pointless ... [because] the Service could defer any and all petitioned-for critical habitat revisions indefinitely ... merely by refusing to publish any *proposed* rules for revisions deemed 'warranted.'" *Id.* 14–15 (emphasis in original).

 The Foundation's argument reads too much into section 4(b)(3)(D)(ii) and

**9.** Under *Chevron v. Natural Resources Defense Council,* "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (citations omitted). A reasonable agency interpretation that is not reflected in a regulation may also merit deference under *Skidmore. United States v. Mead Corp.,* 533 U.S. 218, 234–35, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001).

overstates the definition of the term "proceed." While the 12–Month Finding may be succinct, the statute does not require more at this juncture. Section 4(b)(3)(D)(ii) directs the Service to determine how it intends to proceed and to publish notice of such intention; it does not address the content or efficacy of FWS's determination. Contrary to the Foundation's assertion, the 12–Month Finding does literally state how FWS intends to "proceed": the Service will propose a revision as soon as feasible relying on identified factors.[10] 66 Fed.Reg. 53,573 (Oct. 23, 2001). Obviously, the speed and extent of this process do not meet the Foundation's expectations. But Congress only charged FWS with informing the public of its intentions, leaving a wide berth for the exercise of executive discretion.

A comparison of section 4(b)(3)(D)(ii) to another provision in section 4 of the ESA further elucidates Congress's intent. ESA section 4(b)(3)(A) allows an interested person to petition FWS to list or de-list any species to or from the threatened or endangered species lists. 16 U.S.C. § 1533(b)(3)(A). Like section 4(b)(3)(D)(ii), this provision requires the Service to issue a 12–Month Finding for any petition found "to present substantial information indicating that a petitioned action may be warranted[.]" *Id.* § 1533(b)(3)(B). However, Congress mandated specific actions and a time frame for

listing or de-listing a species. If FWS finds that addition or removal of a species may be warranted under section 4(b)(3)(A), section 4(b)(3)(B) explicitly directs the Service to "promptly publish in the Federal Register a general notice and the *complete text of a proposed regulation* to implement such action ...." *Id.* § 1533(b)(3)(B)(ii) (emphasis added). Section 4(b)(3)(D)(ii) on revising critical habitat designations contains no such express duty. The absence of the kind of specific directions to the Service in section 4(b)(3)(D)(ii) that are so obvious in section 4(b)(3)(B) suggests two conclusions. First, Congress intentionally omitted these requirements, *see FEC v. NRA,* 254 F.3d 173, 194 (D.C.Cir.2001), perhaps because it deems listing species and initially designating critical habitats more important activities. Presumably, Congress depends on the protections of sections 9 and 7 to preserve and help recover those species already listed as endangered. Second, FWS retains wide discretion under the ESA when it comes to re-visiting the complex questions surrounding critical habitat designations. *See* 16 U.S.C. § 1533(a)(3)(B) (FWS "*may,* from time-to-time ..., as appropriate, revise [the critical habitat] designation.") (emphasis added).[11]

The Foundation attacks FWS's interpretation of the statute as being based on "an absurd reading of Congress's intent that

---

10. The 12–Month Finding included a list of criteria that FWS will use when assessing the seaside sparrow's habitat, such as conducting an economic analysis, FWS's intent to publish and propose a rule revising the critical habitat designation, and FWS's coordination efforts with other agencies.

11. The Foundation contends that a comparison to section 4(b)(3)(B)(iii) actually demonstrates the invalidity of the 12–Month Finding. Section 4(b)(3)(B)(iii) allows the Service to find that a listing petition is warranted but precluded by another listing activity. The

Foundation argues, "Congress obviously knew how to authorize the Service to defer taking action on section 4 duties when it wanted to do so. But Congress did not include in section 4(b)(3)(D)(ii) a similar, or any other, authority to defer indefinitely 'warranted' critical habitat revision ...." Pls. Reply at 16. To the contrary, the congressional omission of a "warranted but precluded" finding in section 4(b)(3)(D)(ii) is fully consistent with the legislature's broad grant of discretion to FWS in that provision.

adds absolutely *nothing* of substance to the statutory scheme" because "if the Service's approach were endorsed by the Court, then it is unclear ... why any member of the public would *ever* bother, as plaintiffs did here, to spend the enormous time and resources submitting an exhaustive, scientifically-supported petition seeking a critical habitat revision." Pls. Reply at 15 (emphasis in original). The Court disagrees. A citizen petition to revise critical habitat starts a process that may, as here, ultimately establish an obligation for the Service to act despite its discretion otherwise under section 4(a)(3)(B) of the ESA. Congress requires the Service to review such petitions and to determine their merits on a timely basis. A 12–Month Finding on a citizen petition starts the clock of reasonable timeliness under the APA. Thus, citizen petitions can constrain FWS's discretion when they are scientifically sound and demonstrate that revision of a critical habitat designation is warranted.

Further, publication of a 12–Month Finding provides a measure of transparency to the Service's actions. If FWS does not respond appropriately to a citizen petition to revise a critical habitat designation, Congress can remedy any perceived shortcomings by amending the ESA to include stricter and more detailed requirements. Similarly, through this openness, the public will be able to see how quickly—or slowly, as may be the case—the Service is moving, and can appeal to Congress to appropriate more funds to DOI or lobby the President to replace agency officials.

The Court concludes that FWS complied with ESA section 4(b)(3)(D)(ii) when it published the 12–Month Finding in October 2001. Although cursory, this notice fulfilled the Service's obligation to state "how [FWS] intends to proceed with the requested revision[.]" Because no nondis-cretionary duty under section 4(b)(3)(D)(ii) remains undone with respect to the Cape Sable seaside sparrow, this claim will be dismissed.

### 2. Listing Priority Guidance

The Service's LPG assigns relative priorities to species under consideration for listing as endangered or threatened under section 4 of the ESA. 64 Fed.Reg. 57,114.

> Completion of emergency listings for species facing a significant risk to their well-being remains our highest priority. Emergency actions take precedence over all other section 4 listing actions. With the exception of emergency actions, all other listing activities may be undertaken simultaneously. Regions should assign relative priorities for their remaining non-emergency listing actions based on the following priority levels. Processing final decisions on pending proposed listings are Priority 2 actions. Priority 3 actions are the resolution of the conservation status of species identified as candidates (resulting in a new proposed rule or a candidate removal). Priority 4 actions are the processing of 90–day or 12–month administrative findings on petitions.

*Id.*

The Foundation asserts that FWS unlawfully relied on its LPG when issuing the 90–Day Finding on the Cape Sable seaside sparrow and that the Service "is continuing to apply essentially the same approach to the agency's section 4 duties that is embodied in the LPG that plaintiffs have challenged as contrary to the ESA." Pls. Reply at 35. According to the Foundation, the 2000 LPG violates the ESA by ensuring that "petitions for revision of critical habitat automatically [are] placed in [the] lowest priority regardless of biological necessity." Pls. Motion at 33. FWS contends that it did not rely on the 2000 LPG

for the timing of the 12–Month Finding, which, in any event, it has now published.

Regardless of whether FWS utilized its LPG in making the 90–Day Finding or the 12–Month Finding, this claim will be dismissed as moot because FWS has since published both notices in the Federal Register. *See* 65 Fed.Reg. 42,316 (July 10, 2000); 66 Fed.Reg. 53,575 (Oct. 23, 2001). This issue is "no longer 'live'" and the Foundation lacks a "legally cognizable interest in the outcome." *Fund for Animals v. Jones,* 151 F.Supp.2d 1, 5 (D.D.C.2001). The LPG can no longer delay action on the Foundation's petition, assuming it did in the first place, because FWS has completed all of its current section 4 duties.[12]

### B. Administrative Procedure Act

The APA requires administrative agencies to conclude matters presented to them "within a reasonable time" and empowers reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. §§ 555(b), 706(1). The issuance of equitable relief under section 706 of the APA "is an extraordinary remedy and [the Court] require[s] similarly extraordinary circumstances to be present before [it] will interfere with an ongoing agency process." *Cmty. Nutrition Inst. v. Young,* 773 F.2d 1356, 1361 (D.C.Cir.1985). A finding of unreasonable delay is appropriate "when the delay is 'egregious[,]'" *Cobell v. Norton,* 240 F.3d 1081, 1095 (D.C.Cir.2001) (quoting *Telecomm. Re-*

*search and Action Center v. FCC,* 750 F.2d 70, 79 (D.C.Cir.1984)), and even then a court order to direct agency action should issue only in "exceptionally rare cases[.]" *In re Barr Labs., Inc.,* 930 F.2d 72, 76 (D.C.Cir.1991). "[R]espect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *Id.* at 74.

The D.C. Circuit has articulated four factors to assess when reviewing an "unreasonable delay" claim under the APA.

> [T]o determine whether an agency's delay is unreasonable ... the court should ascertain the length of time that has elapsed since the agency came under a duty to act[; judge] the reasonableness of the delay ... in the context of the statute which authorizes the agency's action[;] ... examine the consequences of the agency's delay[;] ... [and] give due consideration in the balance to any plea of administrative error, administrative convenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.

*In re Int'l Chem. Workers Union,* 958 F.2d 1144, 1149 (D.C.Cir.1992) (internal quotation marks and citations omitted); *see also Telecomm. Telecommunications Research and Action Center v. FCC,* 750 F.2d 70, 80 (D.C.1984).[13] "The ultimate issue

---

**12.** From a practical perspective, it appears unlikely that FWS will rely on the LPG in the future to set priorities for revising critical habitat designations. "[C]hanges in the FY 2000 LPG removed petitions concerning critical habitat from the priority schedule altogether." Defs. Motion at 42.

> The processing of petitions requesting critical habitat designations and the preparation of proposed and final critical habitat determinations and/or designations will no longer be prioritized with other section 4

listing actions. Critical habitat actions will be conducted within a specified amount of funding ($ 979,000 (17% of total) for FY99) which has been set aside out of the listing subactivity.

64 Fed.Reg. 57,114.

**13.** In *TRAC,* the D.C. Circuit

> identified six principles that have helped courts determine when *mandamus* is an appropriate remedy for agency delay: (1) the time agencies take to make decisions

... is whether the time the [agency] is taking to act ... satisfies the 'rule of reason.'" *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C.Cir.2003).

The Court must first resolve when the Service became legally obligated to revise the Cape Sable seaside sparrow's critical habitat designation. *San Francisco Bay-Keeper v. Whitman*, 297 F.3d 877, 885 (9th Cir.2002) (For an APA "unreasonable delay" claim to survive, "the agency must have a statutory duty in the first place."). The Foundation argues that this duty arose in 1983, when FWS issued its Cape Sable Seaside Sparrow Recovery Plan and recognized formally the inadequacy of the seaside sparrow's critical habitat designation. The Service, in contrast, would start the clock no sooner than August 31, 2000, the statutory deadline for publishing the 12–Month Finding on the seaside sparrow.

In response to the Foundation, FWS asserts that "the content of Recovery Plans required under ESA § 4(f) is not binding upon the Service, so cannot create a legal duty." Defs. Reply at 19. Section 4(f) states that FWS "shall develop and implement [recovery] plans ... unless [the

agency] finds that such a plan will not promote the conservation of the species." 16 U.S.C. § 1533(f)(1). Despite this seemingly mandatory language, *see Fund for Animals v. Babbitt*, 903 F.Supp. 96, 111 (D.D.C.1995) ("The word 'shall' is an imperative denoting a definite obligation."), the Service cites *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 547 (11th Cir.1996), for the proposition that Recovery Plans do not command the force of law. In that case, the Eleventh Circuit held that "[s]ection 1533(f) makes it plain that recovery plans are for guidance purposes only. By providing general guidance as to what is required in a recovery plan, the ESA 'breathe[s] discretion at every pore.'" *Id.* (quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir.1975)).

 The Court is generally persuaded by the Eleventh Circuit's reasoning in *Rice* and agrees that the 1983 Recovery Plan was merely a guideline, which FWS had discretion to follow. The MSRP, however, offered more than "general guidance" to the Service; the Court declines to extend the ruling in *Rice* to the MSRP.[14] *Id.* Prepared sixteen years after the origi-

must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency is 'unreasonably delayed.'" *In re Barr Labs., Inc.*, 930 F.2d 72, 74–75 (D.C.Cir.1991) (quoting *TRAC*, 750 F.2d at 80). For purposes of the instant cross mo-

tions, the *TRAC* factors are essentially the same as those listed in *Chemical Workers* and would lead to an identical analysis and outcome.

14. In *Rice*, environmental groups claimed that the Service violated its 1987 Recovery Plan—which included a "Habitat Preservation Plan" calling for monitoring of certain areas—when FWS issued a biological opinion stating that the construction of a landfill in Florida would not jeopardize the endangered Florida panther. The question was whether the Recovery Plan outweighed the biological opinion. Here, there is no issue as to which document has greater force of law—*i.e.*, the MSRP or other agency opinions—because there is no conflict as to the necessity of revising the Cape Sable seaside sparrow's critical habitat designation.

nal Recovery Plan, and based on updated research and data, the MSRP called for revising the seaside sparrow's critical habitat designation and, in particular, specified species-level and habitat-level recovery actions. MSRP, A.R. Vol. 2, Ex. 2, at 4–367 to 4–373. The MSRP committed FWS to "[r]eview and revise the current critical habitat designation based on distribution surveys" because

> [t]he critical habitat, as designated, does not adequately account for the distribution of the present-day core subpopulations, or the areas necessary for continued survival and recovery.... Cape Sable seaside sparrow critical habitat requires significant review and redesignation. When redesignating critical habitat for the Cape Sable seaside sparrow, it will be important to include all potential habitat necessary for recovery, including areas not recently utilized by the birds.

*Id.* at 4–368, 4–352. Given the Service's own assessment of the seaside sparrow's dire situation by 1999, the MSRP can only be seen as a manifestation of FWS's intention finally to revise the critical habitat designation to help save this bird from its near-certain demise. Accordingly, the Court finds that FWS had a duty to revise the Cape Sable seaside sparrow's critical habitat designation beginning in 1999 with the issuance of the MSRP, making the length of the Service's current delay approximately four years.[15]

The second factor in *Chemical Workers* advises courts to examine the reasonableness of an agency's delay in light of the statute authorizing action.

This entails an examination of any legislative mandate in the statute and the degree of discretion given the agency by Congress. The court must also estimate the extent to which delay may be undermining the statutory scheme, either by frustrating the statutory goal or by creating a situation in which the agency is "losing its ability to effectively regulate at all."

*Cutler v. Hayes,* 818 F.2d 879, 897–98 (D.C.Cir.1987) (quoting *Nader v. FCC,* 520 F.2d 182, 207 (D.C.Cir.1975)).

The Foundation argues that the delay here "is fundamentally undermining the ESA, which depends on critical habitat designation as a vital feature of the statutory protections afforded to endangered and threatened species." Pls. Motion at 30. In response, FWS asserts that, because

> Congress imposed express deadlines for issuance of a proposed rule after a 12–month finding on a petition to list a species, but omitted any such deadline with respect to issuance of a proposed rule after a 12–month finding for a critical habitat revision[, Congress intended] to give the Service more leeway over revisions of critical habitat and place[d] a higher priority ... on listing actions for currently unprotected species.

Defs. Motion at 35.

A comparison of the various provisions in section 4 of the ESA, in addition to those cited by FWS, appears to reflect a general congressional priority to listing actions over revisions to critical habitat. *Compare* 16 U.S.C. § 1533(a)(1) (FWS "shall" determine whether a species is endangered or threatened) *and* 16 U.S.C.

---

**15.** It is perhaps academic whether the Court uses the date of the MSRP's issuance or the statutory deadline for publication for the 12–Month Finding as the starting point for the duty to revise the seaside sparrow's critical habitat designation. The approximate one-year time difference between these two events is insufficient under these facts to affect the outcome.

§ 1533(a)(3)(A) (FWS "shall" designate critical habitat at the time a species is listed) *with* 16 U.S.C. § 1533(a)(3)(B) (FWS "may" revise critical habitat designations as appropriate). It must also be remembered, however, that the ESA was "designed to save from extinction species that [FWS] designates as endangered or threatened." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 690, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995). The overall purpose of the statute dictates that the Service is required to "do far more than merely avoid the elimination of protected species. It must bring these species back from the brink so that they may be removed from the protected class, and it must use all methods necessary to do so." *Defenders of Wildlife v. Andrus*, 428 F.Supp. 167, 170 (D.D.C.1977). In situations where FWS has an actual duty to revise a critical habitat designation, such as here, those congressional policy concerns carry substantial weight in judging the reasonableness of the Service's delay.

Moving to the third factor, the consequences of delay, the Service asserts that—despite acknowledging that revision is warranted—"delay in revising the critical habitat for the sparrow is not likely to harm the species, because the sparrow continues to be protected through the 'take' prohibitions under Section 9, the existing critical habitat designation, and Section 7 consultations that prevent jeopardy from occurring to the species." 2nd Decl. of Gary Frazer ¶ 40. Furthermore, FWS states that it "continues to protect the sparrow through many avenues of management, research and recovery." Defs.' Motion at 36. "These efforts involve hosting workshops focused on fire plans to protect the sparrow's habitat, sponsoring monitoring projects of the sparrow's population and coordinating a multi-agency implementation schedule of the South Florida [MSRP] which focuses on the sparrow." *Id.* According to FWS, "these factors . . . show that the extent of prejudice of this delay is less than the resulting prejudice to another species would be if this Court orders expedited revision in this case." *Id.*

The Court seriously doubts that the current protections afforded by ESA sections 7 and 9, in conjunction with FWS's other efforts, are sufficient to stave off the seaside sparrow's extinction; even with these safeguards, the Service's *own* documents show that its failure to revise the critical habitat designation has caused the bird to suffer prejudice. *See, e.g., Balancing on the Brink: The Everglades and the Cape Sable Seaside Sparrow*, A.R. Vol. 5, Doc. 25, at 2 ("If conditions over the last 20 years continue, the Eastern and Western populations will be lost, and the sparrow will become extinct within two decades [of 1998]."). In the 12–Month Finding, the Service emphasized its issuance of a 1999 Jeopardy Biological Opinion to the Army Corps of Engineers that contained Reasonable and Prudent Alternatives ("RPAs"). "These RPAs include[d] elements that [were] designed to protect and improve the habitat of all of the [seaside sparrow's] subpopulations, regardless of whether the specific location of that habitat [was] currently designated as critical habitat." 66 Fed.Reg. 53,575. According to an agency Briefing Statement submitted to the White House on November 30, 2000, however, the implementation of this Jeopardy Biological Opinion has been significantly less than perfect. The Briefing Statement reported:

> Monitoring has shown that the original Corps plan did not meet RPA targets . . . . The best available scientific information indicates that the sparrow has been jeopardized by water management actions for five years and is in extreme danger of extinction if jeopardy condi-

tions continue. RPA targets for the eastern habitats must be met immediately in order to avoid a sixth year of jeopardy conditions.

Briefing Statement, Pls. Motion Ex. A.

The Court credits FWS's contention that it has been working diligently for the seaside sparrow's survival in a variety of ways. Even so, the Service's reports and studies demonstrate the precarious position of the bird and the pressing need to revise its critical habitat. Based on FWS's own findings, the Court concludes that the four-year delay under these circumstances has had, and will continue to have, serious consequences for the seaside sparrow's chances for survival, particularly given the fact that only about 15 years remain before the Service estimates the sparrow could become extinct.

The final *Chemical Workers* factor instructs courts to consider, in relevant part, any difficulties faced by an agency in carrying out its congressional mandate and the need to prioritize tasks. As discussed above, the Service states that it "has been unable to revise the habitat for the sparrow because of a backlog of other required ESA section 4 [actions,] caused initially by a series of congressionally-imposed listing moratoria exacerbated by subsequent insufficient budgets." Defs. Motion at 37. "The simple fact of this situation is that FWS does not have enough money, time, or staff to carry out all the actions currently required of [it]." Defs. Reply at 21. FWS reports that most of its section 4 resources are devoted to complying with court orders and legal settlements. Any remaining energies are spent on listing activities, which FWS considers "arguably more important" than revising critical habitat designations due to the fact that listed species, such as the seaside sparrow, at least have some protections under the ESA, while non-listed species have none. *Id.* at 38.

*In re Barr Labs., Inc.*, 930 F.2d 72 (D.C.Cir.1991), "noted . . . the importance of 'competing priorities' in assessing the reasonableness of an administrative delay[.]" *Mashpee Wampanoag Tribal Council v. Norton*, 336 F.3d 1094, 1100 (D.C.Cir.2003). The D.C. Circuit explained that an "agency is in a unique and—authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way. Such budget flexibility as Congress has allowed the agency is not for us to hijack." *In re Barr Labs., Inc.*, 930 F.2d at 76. "Yet neither a lack of sufficient funds nor administrative complexity, *in and of themselves*, justify extensive delay[.]" *Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C.Cir.2001) (emphasis added).

Four years have passed since the issuance of the 1999 MSRP, which gave rise to FWS's duty to revise the Cape Sable seaside sparrow's critical habitat designation. With the bird's extinction expected in less than two decades, delay will become less and less reasonable despite competing priorities. As of this time, however, the Court cannot say that FWS's delay has gone beyond the rule of reason due to the Service's "need to prioritize in the face of limited resources." *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C.Cir.1992).

FWS has explained its inaction to date, but has not provided sufficient information for the Court to be sure that the Service will ultimately revise the Cape Sable seaside sparrow's critical habitat designation in a timely fashion, in light of the 1999 MSRP and the impending extinction of the species. *See Muwekma Tribe v. Babbitt*, 133 F.Supp.2d 30, 37 (D.D.C.2000) ("[An] ambiguous, indefinite time frame for review of [a] petition [can] constitute[ ] un-

reasonable delay within the meaning of APA § 706(1)."). The Service has proposed no timetable for its future action; "as soon as feasible" is the best it can manage. The Foundation argues that "as soon as feasible" is as good as "never." The Court shares some of that concern. Because of the passage of time since 1999 and the exigencies of the seaside sparrow's situation, the Service will be required to declare a date certain on which work on the revision to the Cape Sable seaside sparrow's critical habitat will begin and to provide an estimate for how long it will take. If the selected date fails to meet FWS's obligation to be timely under the circumstances of the past time lag and the seaside sparrow's plight, the Foundation can raise that APA issue here. In the meantime, therefore, the Court will retain jurisdiction over this case "to monitor the agency's assurances that it is proceeding as diligently as possible with the resources available to it." *Mashpee Wampanoag Tribal Council v. Norton,* 336 F.3d 1094, 1102 (D.C.Cir.2003).

## IV. CONCLUSION

For these reasons, the Court will deny the Foundation's motion for summary judgment, except as noted, and will grant FWS's cross motion for summary judgment, except as noted. Within 60 days of this memorandum opinion, FWS must specify a date on which the Service will begin work on a rule to revise the Cape Sable seaside sparrow's critical habitat designation and provide an estimate as to how long that process will take. FWS's motion for reconsideration will be denied as moot. The Court will retain jurisdiction to monitor the Service's performance. A separate order accompanies this memorandum opinion.

### *ORDER*

For the reasons set forth in the memorandum opinion that accompanies this order, it is hereby

**ORDERED** that Plaintiff's Renewed Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. It is

**FURTHER ORDERED** that Defendants' Cross Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. It is

**FURTHER ORDERED** that, within 60 days, Defendants are directed to specify a date on which the United States Fish and Wildlife Service will begin work on a rule to revise the Cape Sable seaside sparrow's critical habitat designation and to provide an estimate as to how long that process will take. It is

**FURTHER ORDERED** that Defendants' Motion for Reconsideration is **DENIED** as moot. It is

**FURTHER ORDERED** that the Court will retain jurisdiction over this matter to monitor Defendants' performance.

**SO ORDERED.**